# EXHIBIT A

<u>NO QUOTE DEAL</u>

**SLP FILMS, INC.**
**c/o 375 Greenwich Street, 3rd Floor**
**New York, NY 10013**

Dated as of September 21, 2011

**Bruce Cohen Productions (f/s/o Bruce Cohen)**
c/o Bloom Hergott Diemer Rosenthal LaViolette
     Feldman Schenkman & Goodman, LLP
150 S. Rodeo Drive, Third Floor
Beverly Hills, California 90212
Attention:  Alan Hergott, Esq.

       **Re:**     **"Silver Linings Playbook" / Bruce Cohen / Producing Services Agreement**

Dear Ladies and Gentlemen:

This letter shall confirm the principal terms of the agreement ("**Agreement**") reached between, on the one hand, SLP FILMS, INC. ("**Company**"), and, on the other hand, BRUCE COHEN PRODUCTIONS ("**Lender**") for the services of BRUCE COHEN ("**Artist**"), in connection with the producing services of Artist in connection with the motion picture project currently entitled "Silver Linings Playbook" (the "**Picture**").  For good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged), the parties hereby agree as follows:

<u>Conditions Precedent</u>:  Company shall have no obligation under this Agreement unless and until: (i) Company approves in its sole discretion the chain-of-title to the Picture; and (ii) Company receives a fully executed copy of: (a) this Agreement; (b) the Certificate of Engagement attached hereto as Exhibit "A" incorporated herein by this reference (which Company acknowledges it has received); (c) the Inducement Letter attached hereto and incorporated herein by this reference; (d) any and all documents which may be required by any government agency or otherwise for Lender to furnish Artist's services hereunder and to enable Company to effect payment to Lender and Artist hereunder.  The aforementioned subparagraphs (i) and (ii) shall collectively be referred to herein as the "**Conditions Precedent**." Company shall have the right to waive the aforementioned Conditions Precedent at any time in its sole discretion.

1.    <u>Development and Producing Services</u>:  In connection with the Picture, Lender shall cause Artist to render all customary development services for producers of first-class motion pictures which shall include, without limitation, supervising the writing services of all writers engaged by Company in connection with the development of the Picture.   Artist's development services hereunder shall be rendered on a non-exclusive basis, provided there is no material interference with the full performance of Lender and Artist's obligations.  If Company (in the exercise of its sole discretion) elects to proceed with the production of the Picture with Artist as the producer thereof, then Lender shall cause Artist to render all services customarily rendered by individual producers in the motion picture industry for first-class motion pictures in connection with the pre-production, production and post production of the Picture. Artist's services shall be rendered on an exclusive basis, commencing eight (8) weeks prior to the start, if ever, of principal photography of the Picture and continuing until the conclusion of principal photography, and thereafter on a non-exclusive, first-priority basis until complete delivery of the Picture to Company in accordance with the Company approved post-production schedule.  Time is of the essence in connection with all producing services and delivery of the Picture hereunder.

2.    <u>Fixed Compensation</u>:  If the Picture is produced with Artist as producer thereof and Lender and Artist fully perform all services and obligations hereunder and in relation to the Picture, and Lender and

<div align="center">NO QUOTE DEAL</div>

Artist are not otherwise in breach hereof, Lender shall be entitled to receive the amount of Two Hundred Fifty Thousand Dollars ($250,000) (the "**Fixed Compensation**").  The Fixed Compensation shall be payable pursuant to a 20:80 payout schedule (i.e., 20% payable weekly during the eight [8] weeks preceding principal photography; and 80% payable weekly during principal photography) and shall constitute an all inclusive "flat" fee such that no additional compensation shall be payable by reason of overtime, overages, Sundays, holidays, etc.

3.      Contingent Compensation: If the Picture is produced with Artist as the producer thereof and Lender and Artist fully perform all required services and obligations hereunder and in relation to the Picture, and are not otherwise in breach or default hereof, Artist shall be entitled to receive the following "**Contingent Compensation**":

        (a)      5% of 100% of "Adjusted Gross Receipts" (if any) payable prospectively from and after "Cash Breakeven" (as both such terms are defined below) is reached, but calculated with an across-the-board 15% distribution fee.

        (b)      "**Adjusted Defined Receipts**", "**Cash Breakeven**" and "**Contingent Proceeds**" shall be defined, computed, paid and accounted for in accordance with the terms and conditions of Company's Exhibit "DRCB" and Exhibit "CB", as modified only by the Riders to such Exhibits, attached hereto and incorporated by reference (and in any event to be defined, computed, paid and accounted for no less favorably than Jon Gordon ["**Gordon**"] with respect to the Picture).  "Cash Breakeven" shall mean the point at which "Contingent Proceeds" are first achieved, but calculated utilizing the applicable distribution fees referred to above.  Company makes no representation that the Picture will generate any Contingent Compensation, or any particular amount of Contingent Compensation.

4.      Credit:    Subject to Company's standard exclusions and exceptions (including artwork title exceptions), and provided that the Picture is produced and further provided that the Picture is produced with Artist as producer thereof, and Lender and Artist fully perform all services and obligations hereunder and in relation to the Picture, and are not otherwise in breach hereof, then Company shall accord Artist "Produced by" credit in second position, which credit shall be shared, on screen in the main titles (unless the Picture is in end title format), in the billing block portion of paid ads issued or controlled by Company in which the regular billing block appears, in which any other individual producer is credited, and in the billing block portion of so-called excluded ads issued or controlled by Company in which Donna Gigliotti is accorded credit in such billing block, other than in award, nomination or congratulatory ads, and ads announcing a personal appearance in which no person other than the person awarded, nominated, congratulated or appearing is mentioned and group, institutional list or voice over paid ads (collectively, "**Special Ads**").

        The size, style, thickness and type of the foregoing "Produced By" credits shall be no less favorable than that accorded to any other producer credits on the Picture, respectively.  Except as set forth herein, all other characteristics of such credit shall be in Company's sole discretion. No casual or inadvertent failure by Company, nor any failure by any third party, to comply with the terms of this Paragraph 4 shall constitute a breach hereof, provided, however, that upon receipt of written notice from Artist specifying a failure to accord credit as specified hereunder, Company shall use reasonable efforts to cure prospectively such material failure with regard to ads created and/or positive prints manufactured after the date of Company's receipt of such notice. Company shall use reasonable efforts to notify its subdistributors of the credit obligations set forth herein, provided, however, any breach by Company's subdistributors to accord properly such credit shall not constitute a breach by Company.

5.      Travel and Expenses:   If Company requires Artist to travel more than fifty (50) miles from Artist's then principal place of residence (presently Los Angeles, California) (a "**Distant Location**") for

**NO QUOTE DEAL**

the purposes of rendering services in connection with any Picture hereunder, then, with respect to the Picture, Artist shall be entitled to receive: (i) one (1) business-class (if available and used for such purpose) round trip transportation (by air if appropriate) for Artist to and from New York and Los Angeles, and one (1) additional business-class (or best available) (if available and used for such purpose) round trip transportation (by air if appropriate) for Artist to and from Philadelphia and Los Angeles; (ii) non-exclusive ground transportation to and from location sets and hotels (shared with above-the-line personnel only); (iii) exclusive ground transportation to and from airports; (iv) an expense allowance of $2,500 per week (which shall be no less favorable than that accorded to Gordon); (v) a mid-size insured rental car (with reasonable parking expenses to be covered by Company); and (vi) up to six (6) business-class roundtrip train transportations to and from New York and Philadelphia (if available and if used for this purpose); during the period that Artist is required by Company to render services at such Distant Location in connection with the Picture. With respect to the provision of the rental car, Lender and Artist acknowledge and agree that Company shall not reimburse Artist for parking tickets or any other such citations and Company shall not be responsible for any costs related to maintenance or repairs. In the event that unpaid parking violations or any other citations are reported to Company while Artist is rendering services for Company or after Artist has concluded employment with Company, Artist shall be responsible for any bail amount and/or processing fees with respect to such parking tickets and citations. Company shall not be responsible for any other travel, expenses or perquisites of Artist. All travel arrangements, including, but not limited to, the acquisition of airline tickets, booking of accommodations, etc., shall be made through Company's location or travel department, unless prior written approval is obtained from a Company Business Affairs executive.

6.      Approvals and Controls:  Company shall retain all approvals and controls, including, without limitation, with respect to the producer and the right to designate the production manager, estimator and location auditor, and the right to initiate action at any time and in any respect in connection with the Picture. Notwithstanding the foregoing, Company shall consult with Artist (with Company's decisions controlling) with regard to key creative matters (i.e., principal cast, location, key crew, music, composer, final screenplay) in connection with the Picture, provided that in the event of a deadlock on all matters, Company's decision shall be final and binding. No casual or inadvertent breach of this paragraph shall be deemed a breach of this Agreement.

7.      Assistant:  Provided that Artist fully performs all of the required services and obligations hereunder, and Artist is not in uncured material breach or default hereof, while Artist is rendering exclusive services required by Company hereunder in connection with the production of the Picture, Company shall furnish Artist with use of an exclusive assistant (which Artist shall have the right to designate) for Artist's use in connection with Picture-related matters. If Artist elects to use Artist's regular assistant while Artist is rendering services at a Distant Location, said assistant shall be provided with a fee of Eight Hundred Dollars ($800) per week, crew accommodations, crew level per diem, a rental car and one (1) coach round-trip air transportation in connection with such assistant's services at such Distant Location. In the event Artist elects not to use Artist's regular assistant, Company shall have the right to provide Artist with a local assistant, subject to Artist's reasonable approval. If a local assistant is provided by Company, the salary and perquisites accorded to such local assistant shall be determined by Company in its sole discretion.

8.      Promotional Films:  Company contemplates filming and exploiting films including, without limitation, "behind-the-scenes" or "making-of" productions, (jointly and severally "**Promotional Rights**") about the production of the Picture produced hereunder. Artist hereby agrees and consents to such filming and exploitation (including, without limitation, use of any film clip footage from the Picture and behind-the-scenes photography and filmed interviews with Artist) and hereby grants to Artist the right to use Artist's name, voice and likeness which Artist shall be given the opportunity to approve in customary industry fashion in connection with such Promotional Rights for no additional consideration inasmuch as the compensation payable to Artist under this Agreement for the Picture shall be deemed to include compensation for all rights granted pursuant to this Paragraph 8. Company shall use all reasonable efforts to notify Artist in advance of the making of any such promotional films hereunder.

<u>NO QUOTE DEAL</u>

9.      <u>Ownership and Distribution</u>:  The results and proceeds of Lender's and Artist's engagement and services hereunder in connection with the Picture shall be deemed works-made-for-hire specially ordered or commissioned by Company in connection with a motion picture and/or audiovisual work.  Company shall exclusively own all now known or hereafter existing rights of every kind throughout the universe, in perpetuity and in all languages, pertaining to such results and proceeds, and all elements therein for all now known or hereafter existing uses, media, and forms, including, without limitation, all copyrights (and renewals and extensions thereof), motion picture, television, video cassette and video or laser disc, video on demand, subscription video on demand, any computer-assisted media (including, but not limited to CD-ROM, CD-I and similar disc systems, interactive cable and any other devices or methods now existing or hereinafter devised), character, prequel, sequel, remake, merchandising, soundtrack, novelization, Internet and any and all allied and ancillary rights therein, and the foregoing is inclusive of a full assignment to Company thereof.  If for any reason the results and proceeds of Artist's services hereunder are not deemed for a work-for-hire for Company, then Artist hereby assigns, grants and sets over unto Company all of Artist's rights of every kind and nature, including all rights of copyright, in and to the Picture and all of the results and proceeds of Artist's services hereunder.  Artist hereby waives or grants to Company any "moral rights" or "*droit moral*" in any jurisdiction in and to the Picture.  No breach of this Agreement by either party shall in any way affect Company's ownership of the Picture or all rights therein.  Lender and Artist hereby grant to Company the right to issue and authorize publicity concerning Artist, and to use Artist's name, voice, approved likeness and approved biographical data in connection with the distribution, exhibition, advertising and exploitation of the Picture; provided, however, that in no event shall Artist be depicted as endorsing any product, commodity or service without Artist's prior written consent. Lender and Artist shall exercise approvals hereunder reasonably and within five (5) days after request by Company, or such approvals shall be deemed given.

10.      <u>No Obligation to Use</u>:  Company is not obligated to develop, produce, distribute, and/or exploit the Picture, or, if commenced, to continue the development, production, distribution, or exploitation of the Picture in any territory. Regardless of whether or not Company elects to develop, produce, distribute and/or exploit the Picture (or to commence same), Company is not obligated to use the services (in whole or in part) of Artist hereunder, provided that the foregoing shall not relieve Company of its payment obligations to Artist in accordance with the terms and conditions set forth herein and Company's indemnity and insurance obligations hereunder shall survive the termination of this Agreement.

11.      <u>Employment Eligibility</u>:  Lender and Artist acknowledge that any offer of employment hereunder is subject to and contingent upon Artist's ability to prove his identity and employment eligibility as required by the Immigration Reform and Control Act of 1986.  Accordingly, Artist hereby agrees: (i) to complete and execute Section 1 ("**Employee Information and Verification**") of an Employment Eligibility Verification ("**Form I-9**") at the time of execution of this Agreement or commencement of services, whichever is earlier; and (ii) to deliver, in person, to Company said Form I-9, together with documentation of the employment eligibility of Artist, within three (3) business days of execution of this Agreement or commencement of services, whichever is earlier.  If Artist fails to complete and deliver the Form I-9 as provided above, Company shall have the right, if Lender or Artist fails to cure such breach within three (3) business days of receiving written notice to such effect, to terminate the Agreement and thereupon Artist's engagement hereunder shall cease and terminate and neither party shall have any right, duty or obligation to the other under this Agreement except such as shall have accrued prior to the effective date of termination.

12.      <u>Delivery/Specifications</u>:   To the extent within Artist's control, Artist shall deliver the completed Picture to Company within a post production schedule approved by Company.  "**Delivery**" shall be deemed to have occurred only upon delivery to Company of an answer print which conforms to all of Company's standard delivery requirements, which requirements include, but are not limited to, those contained in the remainder of this paragraph. If Company (in the exercise of its sole discretion) elects to

proceed to production and Lender and Artist render producing services on the Picture, to the extent within Artist's control, the Picture shall: (i) conform to the final version of the screenplay approved by Company, except for any minor non-material changes as may be necessitated by the exigencies of production, if any, and such other changes as may be pre-approved by Company in writing; (ii) shall be of first-class technical quality and photographed in the English language, in color in 35mm film and capable of being projected with an aspect ratio of 1:1.85 with no hard matte; (iii) shall be delivered with a running time, inclusive of main and end titles (with end titles not to exceed 3 minutes), of no less than 95 minutes and no more than 110 minutes; shall be capable of receiving a MPAA rating no more restrictive than "R" (unless Company agrees to a more restrictive rating); and (iv) shall be produced using only first-class facilities and equipment for photographs, recording, film processing, scoring, dubbing and all other aspects of production and post-production, shall be completely finished, fully edited and titled and fully synchronized with language, dialogue, sound and music.   Upon delivery of the Picture, to the extent within Artist's control, there shall be no liens (other than the customary SAG and DGA lien if the Picture is SAG and DGA, provided that the Picture shall not be SAG or DGA without Company's prior written approval) against the Picture and all costs of its production (including, but not by way of limitation any and all music costs and/or licenses) shall be paid.   The production shall be run with standard financial controls, including, without limitation, double signatures required on all fundings to the production and on all production checks.   There shall be no material changes in the specifications without Company's prior written approval.   To the extent within Artist's control, Delivery shall be made in accordance with Company's standard Delivery Schedule (subject to such changes as the parties may agree to in writing after good faith negotiation which can be made within the parameters of the budget of the Picture), with a review period of forty-five (45) days from Company's receipt of all items.

13.      <u>First Opportunity</u>:  For a period of seven (7) years after the initial release of the Picture, provided that neither Lender nor Artist is in uncured material breach or default hereof, if Company (or its successors, assigns or licensees) elects, in its sole discretion, to produce a theatrical motion picture (including, without limitation, a theatrical sequel or prequel motion picture to and/or theatrical motion picture remake of the Picture) (individually and collectively, a "**Theatrical Production**"), a direct-to-video production ("**DTV Production**") or a "**T.V. Production**" (including a pilot, an initial episode of a series, prequel, MOW and/or series) based on the Picture (individually and collectively, a "**Subsequent Production**"), and if Artist is then active as a producer in the motion picture or television industry, as applicable, and if the Picture was completed at a final below-the-line cost not exceeding one hundred ten percent (110%) of the Company approved in-going below-the-line budget (excluding costs incurred due to force majeure, third party breach, currency fluctuations, changes approved in writing by a business affairs executive of Company, retroactive union scale increases, and losses to Company reimbursed by insurance), and Artist is available when reasonably required by Company then Artist shall have the first opportunity to render producing services in connection with such Subsequent Production on terms to be negotiated in good faith within the Company's usual parameters for comparable engagements, taking into account Artist's stature and precedent.  With respect to a Theatrical Production, provided the budget of such Theatrical Production is not less than 90% of the budget of the Picture, the financial terms and conditions for the engagement of Artist shall be no less favorable than those set forth in this Agreement. With respect to DTV Productions and T.V. Productions, the financial terms for the engagement of Artist shall be negotiated in good faith in accordance with industry standards in effect at such time, taking into account Artist's stature and precedent.   Artist's engagement in connection with a T.V. Production shall also be subject to network or other licensee approval, which Company shall use reasonable good faith efforts to obtain. If Artist elects not to render producing services on a Subsequent Production, or if Artist is unavailable, or if no agreement is reached between Company and Artist within thirty (30) business days following Company's notice to Artist of the commencement of negotiations for Artist's services, then Company shall have the right to engage alternative producers and shall have no further obligation to Artist under this Agreement with respect to such Subsequent Production.   The provisions of this Paragraph 13 shall apply to Artist personally and not to any heirs, executors, administrators, successors or

**NO QUOTE DEAL**

assigns of Artist.  Artist shall have the right described in this Paragraph 13 on a "rolling basis" (i.e., for each and every Subsequent Production; provided that all of the foregoing requirements are satisfied on the immediately preceding production).

14.    <u>Representations, Warranties and Undertakings</u>:  Lender and Artist hereby represent and warrant to Company as follows: (a) Lender and Artist are authorized and free to enter into this Agreement with Company, to furnish services to Company hereunder, and to grant to Company the rights herein set forth; (b) neither Lender nor Artist is nor will become subject to any conflicting obligations or any disability which prevent or materially interfere with the execution and performance of this Agreement; (c) Lender and Artist shall fully perform each and all of the terms and obligations of this Agreement; (d) no rights of any third party are or will be violated by Lender's and Artist's entering into or performing this Agreement, and neither Lender nor Artist has made nor shall hereafter make any agreement with any third party which could interfere with the rights granted to Company hereunder or the full performance of Artist's obligations or Artist's services hereunder; (e) all of the Lender's and Artist's work shall be wholly original with Lender and Artist and none of the same has been or will be copied from or based upon any other work, other than material assigned to Artist for incorporation into Artist's work or in the public domain (it being agreed that Artist shall give Company written notice of any material Artist incorporates into Artist's work which is other than in minor part derived from the public domain); (f) to the best of Lender's and Artist's knowledge, in the exercise of due diligence and reasonable prudence, any of the rights herein granted shall not defame any person or entity nor violate any copyright, right of privacy or publicity, or any other right of any person or entity; and (g) Lender and Artist acknowledges that the Federal Communications Act makes it a criminal offense for any person, in connection with the production or preparation of any program intended for broadcasting, to accept or pay money, service or other valuable consideration for the inclusion of any matter as a part of any such program without disclosing the same to the employer of the person to whom such payment is made or to the person for whom such program is being produced; and Artist understands that it is the policy of Company not to permit any employee of Company to accept or pay any such consideration, and Lender and Artist represent and agree that Artist has not accepted and will not accept, and has not paid and will not pay, any money, service or other valuable consideration for the inclusion of any "plug", reference, or product identification, or of any other matter, in any program produced hereunder.

15.    <u>Indemnification</u>:  Lender and Artist agree to indemnify and otherwise hold Company, and its affiliated companies, licensees, agents, successors, assigns, directors, officers and employees, harmless from and against any losses, liabilities, claims, demands, damages, charges, expenses and costs (including reasonable outside attorneys' fees and expenses) incurred by reason of any third party claims arising from the breach of Lender or Artist's representations, warranties or covenants contained in this Agreement, any other agreement between Lender and Artist, on the one hand, and Company, on the other hand, concerning the Picture, or between Lender and Artist, on the one hand, and a third party, on the other hand, concerning the Picture, or involving any third party's claim to an amount payable hereunder.  If Company so elects, Company shall have the absolute right to control the litigation or resolution of any claim, demand or action to which this indemnity applies.  Company shall have the sole right to control the legal defense of any such claims, litigation, etc., including, the right to select counsel of its choice and to compromise or settle any such claims, demands or litigation.  The party receiving notice of any such claim, demand or action shall promptly notify the other party hereof.  Company agrees to indemnify and defend and otherwise hold Artist harmless from and against any losses, liabilities, claims, demands, damages, charges, expenses and costs (including reasonable outside attorneys' fees and expenses) incurred by reason of any third party claims arising from the development, production, financing, distribution, advertising or exploitation of the Picture or any element thereof by any means and in all media (including, without limitation, motion pictures based thereon), save in each instance for any such losses, liabilities, claims, demands, damages, expenses and costs arising out of any breach of any representations, warranties or covenants by Artist hereunder. Company's indemnification obligations as

described herein above shall be subject to the following conditions: that (i) Lender and Artist shall cooperate fully with Company in the defense of any such claim or legal action at no cost or charge to Company, other than the reimbursement to Artist of reasonable out-of-pocket costs and expenses incurred in connection with the defense of any such claim or legal action, excluding attorneys' fees if Lender and/or Artist elects to self-defend; (ii) Company shall have the right to select and retain any legal counsel in connection with the defense of any such claim or legal action and shall pay the attorneys' fees associated therewith; and (iii) Company, in its sole discretion, shall have the right to defend, compromise and/or settle any such claim or legal action, and Company shall control all matters in connection therewith.

16.     Insurance:  Lender and Artist shall be added as additional insureds on Company's errors and omissions insurance policy and general liability insurance policy which Company may obtain for the Picture, subject to the limitations, restrictions and terms of said policies.  Lender and Artist acknowledge that there shall be no obligation to obtain or maintain any such coverage. The provision of such insurance coverage shall not be construed so as to limit or otherwise affect any obligation, representation, warranty or agreement of Artist hereunder.

17.     Assignment:  Company shall have the right to assign this Agreement, in whole or in part, and the rights, licenses and privileges granted to it hereunder, and to delegate its duties at any time and from time to time, in whole or in part to any person or entity, provided that such person or entity assumes Company's obligations in writing, and, upon such assignment, Company shall be released and discharged of and from any and all of its duties, obligations and liabilities arising under this Agreement if such assignment is to: (a) a person or entity into which Company merges or is consolidated or (b) a person or entity which acquires all or substantially all of Company's business and assets or (c) a person or entity which is controlled by, under common control with, or controls Company or (d) any major or "mini-major" motion picture company, United States television network or (e) other financially responsible party.  No rights or obligations of Artist hereunder may be assigned or delegated to any third party.

18.     DVD/Soundtrack:  Provided that Lender and Artist fully perform all services and obligations hereunder, and are not otherwise in material breach hereof, then Company shall furnish each member of Artist with a DVD copy (Blu-ray, if available) of the Picture and a soundtrack album for the Picture, at no charge, promptly following Artist's written request therefor after the date, if ever, that such DVD copies and/or soundtrack albums are available to the general public; provided however that Artist executes Company's then applicable use-restriction agreement in connection therewith.

19.     Premiere:  Provided that Lender and Artist fully perform all required services and obligations hereunder and are not otherwise in uncured material breach hereof, Artist and a non-business companion of each shall be invited to the first U.S. celebrity premiere of the Picture, if any, and if such premiere is more than fifty (50) miles from Artist's principal residence, then for such premiere, each of Artist and his non-business guest shall receive round-trip business class transportation (by air if appropriate), if available and used for this purpose, plus Artist only shall receive first class hotel accommodations and expenses in accordance with Company's then existing policy.

20.     No Injunctive/Equitable Relief:  The rights and remedies of Lender and Artist in the event of any breach by Company of the provisions of this Agreement shall be limited to Lender's and/or Artist's right, if any, to recover damages in an action at law, and Lender and Artist irrevocably waive any right to seek and/or obtain equitable or injunctive relief.  In no event shall Lender or Artist be entitled by reason of any such breach to terminate this Agreement or to enjoin or restrain the exhibition, distribution, advertising, exploitation, or marketing of the Picture and/or any rights therein.

21.    <u>Further Assurances</u>:  At Company's request, Lender shall cause Artist to execute any and all additional documents and instruments (not inconsistent with the terms hereof) reasonably deemed by Company to be necessary to effectuate the purposes of this Agreement; provided that Artist shall have a reasonable opportunity to review and negotiate in good faith any such documents.  Company shall promptly furnish a copy of any such executed documents to Artist, provided that no casual or inadvertent failure to do so shall be a breach hereof or otherwise affect the validity of any such documents.  Lender and Artist hereby appoint Company, or its nominee, as Lender's and/or Artist's irrevocable attorney-in-fact, with full power to execute, acknowledge, deliver and record in the U.S. Copyright Office or elsewhere any and all such documents Lender and Artist fail to execute, acknowledge and deliver within five (5) business days of Company's request therefor.  The appointment shall be a power coupled with an interest.  Furthermore, as Lender and Artist's attorney-in-fact, Company shall have the right, but not the obligation, for the sole benefit of Company, and at Company's expense, to bring, prosecute, defend and appear in suits, actions, and proceedings of any nature concerning all copyrights in and to the Picture, all products of Lender's and/or Artist's services hereunder, and all renewals thereof, or concerning any infringement of any such copyright or renewal copyright, or any interference with any of the rights herein granted to Company; and to take such action as Company may deem advisable to enforce, protect, and/or defend any of the rights, privileges and property herein granted to Company under any and all such copyrights and renewals thereof, as well as any of the rights, licenses, privileges, warranties and agreements contained and/or set forth in any of the documents herein referred to, insofar as the same relate to the rights, privileges and property herein granted to Company; and to litigate, collect and give receipt for all damages arising from any infringement of any such rights.  Any such action may be taken by Company in the name of Lender and/or Artist or otherwise, and Company may join Lender and/or Artist as a party plaintiff or defendant in any such suit, action or proceeding, and if Company so joins Lender and/or Artist, Company will meaningfully consult with Lender with respect to any settlement or compromise of any action regarding the foregoing rights, provided that Company's final decision (in the exercise of its sole discretion) in connection with such settlement or compromise of any such action shall be binding at all times.  The foregoing power of attorney shall be deemed a power coupled with an interest.

22.    <u>Notices</u>.  Any notice pertaining hereto shall be in writing.  Any such notice and any payment due hereunder shall be served by delivering said notice or payment personally or by sending it by mail or facsimile (postage or applicable fee prepaid), addressed as follows (or as subsequently designated in writing):

<div style="margin-left: 2em;">

To Lender and Artist:   c/o Bloom Hergott Diemer Rosenthal LaViolette
      Feldman Schenkman & Goodman, LLP
150 S. Rodeo Drive, Third Floor
Beverly Hills, California 90212
Attention:  Alan Hergott, Esq.
Fax: (310) 860-6803

To Company:   SLP Films, Inc.
c/o The Weinstein Company LLC
9100 Wilshire Boulevard, Suite 700W
Beverly Hills, California 90212
Attn.: Adrian Lopez, Vice President, Business and Legal Affairs
Fax:  (310) 550-5759

</div>

The date of personal delivery, or facsimile of such notice or payment shall be deemed the date of service of such notice payment and a notice sent by mail shall be deemed to be served five (5) business days after the date of mailing.  Any notice from Artist which commences the running of any period of

**NO QUOTE DEAL**

time for Company's exercise of any option or Company's performance of any other act shall be deemed to be served only when actually received by Company. If the last day on which the parties hereto are empowered to give notice pursuant to any provisions of this Agreement or to perform any other act which parties are required or may desire to perform under or in connection with this Agreement should fall on a Saturday, Sunday or holiday, then the parties hereto shall have until the end of the first full business day following said Saturday, Sunday or holiday within which to give such notice or to perform such act.

23.    <u>Miscellaneous:</u>    This Agreement, including Company's standard terms and conditions for agreements of this kind are incorporated herein by reference, subject to any changes to which the parties may mutually agree in writing after any good faith negotiations within Company's customary parameters for producers of Artist's stature and precedent, expresses the full and complete understanding between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings (whether oral or written) with respect hereto and may be amended or modified only by the written agreement of Lender, Artist and Company. This Agreement shall be governed by New York law and shall be subject to the exclusive jurisdiction of the Federal and State Courts of New York. This Agreement may be executed in one or more counterparts, and when executed by each of the parties signatory hereto, said counterparts shall constitute a valid, binding agreement.  An executed counterpart returned electronically shall be deemed an original.

Sincerely yours,

**SLP FILMS, INC.**

By: _____
Its: _____


<u>**ACCEPTED AND AGREED TO:**</u>

**BRUCE COHEN PRODUCTIONS**

By: _____
Its: _____

**Exhibit A**

CERTIFICATE OF ENGAGEMENT

SLP Films, Inc. ("Company"), whose address is c/o 375 Greenwich Street, New York, NY 10013, has engaged Bruce Cohen Productions ("Lender") f/s/o BRUCE COHEN ("Artist") in connection with Artist's producing services on a motion picture project tentatively entitled "SILVER LININGS PLAYBOOK" (the "Picture"). The principal terms and conditions of Lender's and Artist's engagement for the Picture are set forth in that certain agreement ("Agreement") dated as of September 21, 2011, between, on the one hand, Company, and, on the other hand, Lender and Artist, which Agreement is being negotiated in good faith, and which terms and conditions are incorporated herein by this reference.

For good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), Lender and Artist do hereby acknowledge, certify and agree that all results and proceeds of every kind of the services heretofore and hereafter to be rendered by Lender and/or Artist in connection with the Picture, including without limitation all ideas, suggestions, themes, plots, stories, characterizations, dialogue, titles and other material, whether in writing or not in writing, at any time heretofore or hereafter created or contributed by Lender and/or Artist which in any way relate to the Picture or to the material on which the Picture will be based (collectively, the "Material"), are and shall be deemed to be works made for hire for Company. Accordingly, Company is and shall be considered the author and, at all stages of completion, the sole and exclusive owner of the Material and all right, title and interest therein (the "Rights"). The Rights shall include without limitation all copyrights, neighboring rights, trademarks and any and all other ownership and exploitation rights in the Material now or hereafter recognized in any and all territories and jurisdictions including, by way of illustration, production, reproduction, distribution, adaptation, performance, fixation, rental and lending rights, exhibition, broadcast and all other rights of communication to the public, and the right to exploit the Material throughout the universe in perpetuity in all media, markets and languages and in any manner now known or hereafter devised. If under any applicable law the fact that the Material is a work made for hire is not effective to place authorship and ownership of the Material and the Picture and all rights therein in Company, then to the fullest extent allowable and for the full term of protection otherwise accorded to Lender and/or Artist under such applicable law, Lender and Artist hereby assign and transfer to Company the Rights and, in connection therewith, any and all right, title and interest of Lender or Artist in the Picture and any other works now or hereafter created containing the Material.

Lender and Artist hereby grant Company the right to change, add to, take from, translate, reformat or reprocess the Material in any manner that Company may in its sole discretion determine. To the fullest extent allowable under any applicable law, Lender and Artist hereby irrevocably waive or assign to Company their so-called "moral rights" or "*droit moral*". Lender and Artist expressly acknowledge that many parties will contribute to the Picture and other works that will embody all or part of the Material. Accordingly, if under any applicable law the above waiver or assignment by Lender or Artist of "moral rights" or "*droit moral*" is not effective, then Lender and Artist agree to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

Lender and Artist will, upon reasonable request, execute, acknowledge and deliver to Company any and all documents consistent herewith which Company may reasonably deem necessary to evidence and effectuate all or any of Company's rights hereunder. Lender and Artist hereby irrevocably appoint Company as attorney-in-fact with full power to execute, acknowledge, deliver and record in the U.S. Copyright Office or elsewhere any and all such documents Lender and Artist fail to execute, acknowledge and deliver within five (5) business days of Company's request therefor. The appointment shall be a

power coupled with an interest.  Copies of any such documents executed on Lender and Artist's behalf by Company shall promptly be forwarded to Lender and Artist's representatives.

Lender and Artist hereby grant to Company the right to issue and authorize publicity concerning Artist, and to use Artist's name, voice, approved likeness and approved biographical data in connection with the distribution, exhibition, advertising and exploitation of the Picture.  Lender and Artist shall exercise approvals hereunder reasonably and within five (5) days after request by Company, or such approvals shall be deemed given.

Lender and Artist warrant that, except for material supplied and/or assigned to Artist by or on behalf of Company for incorporation in the Material or incorporated into the Material by employees or officers of Company other than Artist, the Material is or will be original with Artist or is in the public domain throughout the world, and to the best of Lender's and Artist's knowledge (in the exercise of reasonable prudence), is not and will not be based in whole or in part on the life of any real person except as approved in writing by Company, and, to the best of Lender's and Artist's knowledge (in the exercise of reasonable prudence), does not and will not infringe upon or violate any copyright of, or infringe upon or violate the right of privacy or any other right of, any person; and that Lender and Artist are free to grant all rights granted and make all agreements made by them herein; and that Lender is a corporation duly organized and existing under the laws of the state of its incorporation.  Lender and Artist agree to hold Company and its successors, licensees and assigns harmless from and against all damages, losses, costs, and expenses (including reasonable outside attorneys' fees and costs) which Company or any of its successors, licensees or assigns may suffer or incur by reason of the breach of any of the warranties made in this paragraph. If Company so elects, Company shall have the absolute right to control the litigation or resolution of any claim, demand or action to which this indemnity applies.  Company shall have the sole right to control the legal defense of any such claims, litigation, etc. including, the right to select counsel of its choice and to compromise or settle any such claims, demands or litigation.  The party receiving notice of any such claim, demand or action shall promptly notify the other party hereof.

Company shall defend, indemnify and hold harmless Lender and Artist against any and all liability, damages, costs and expenses, including reasonable attorneys' fees, in connection with any claim or action (other than those arising out of a breach of Lender's and/or Artist's warranties hereunder or out of any criminal, malicious or willful tortious acts by Artist) respecting material supplied to Lender and/or Artist by Company or solely in connection with activities regarding the Company's development, production, distribution or exploitation of the Picture or any element thereof and/or ancillary rights therein, provided that (i) Artist cooperates fully with Company in the defense of any such claim or legal action at no cost or charge to Company other than the reimbursement to Lender of reasonable out-of-pocket costs and expenses incurred in connection with the defense of any such claim or legal action excluding legal fees; (ii) Company shall have the right to select and retain any legal counsel in connection with the defense of any such claim or legal action and shall pay the attorneys' fees associated therewith (provided that Artist shall be afforded reasonable opportunity to have a separate counsel of Artist's choice participate in such litigation or resolution of any claim, but in any event, Company's final decision(s) shall control); and (iii) Company, in its sole discretion, shall have the right to defend, compromise and/or settle any such claim or legal action (provided that Artist shall have the right to approve any compromise or settlement which involves an admission of liability on the part of Artist, provided that Lender and Artist furnish Company with a surety bond or irrevocable letter of credit for the reasonably anticipated liability in connection with such claim (as determined by Company in good faith), demand or litigation.  The party receiving notice of any such claim, demand or action shall promptly notify the other party hereof.

Lender and Artist hereby covenant and agree that Lender and Artist shall not have or be deemed to have any lien, charge or other encumbrance upon any of the rights conveyed to Company herein or proceeds derived therefrom, and that no act of or omission by Company, nor any other act, omission or

event of any kind, shall terminate or otherwise adversely affect Company's ownership of the rights conveyed herein.  Lender's and Artist's sole remedy for any such breach or alleged breach shall be an action at law to recover such damages as may have been actually suffered by them as a result thereof.

Executed as of September 21, 2011.

ACCEPTED AND AGREED:

Bruce Cohen Productions


By: _____

Its: _____

COUNTERSIGNED:


_____
BRUCE COHEN

EXHIBIT "B"

<u>INDUCEMENT</u>

Reference is made to that certain agreement (the "**Agreement**") dated as of September 21, 2011, by and between, on the one hand, SLP FILM, INC. ("**Company**") and, on the other hand, BRUCE COHEN PRODUCTIONS ("**Lender**") for the producing services of BRUCE COHEN ("**Artist**" or "**I**", "**me**", "**my**", "**mine**"), in connection with the motion picture tentatively entitled "Silver Linings Playbook" ("**Picture**").

1.      I am familiar with all of the terms, covenants and conditions of the Agreement and I hereby consent to the execution thereof.  I shall perform and comply with all of the terms, covenants, conditions and obligations of the Agreement, even if the employment between me and Lender should hereafter expire, terminate or be suspended.  I hereby confirm all grants, representations, warranties and agreements made by the Lender under the Agreement.

2.      Unless I am deemed substituted for the Lender as a direct party to the Agreement pursuant to Paragraph 4 below, I shall look solely to Lender and not to Company for the payment of compensation for my services and for the discharge of all other obligations of my employer with respect to my services under the Agreement.

3.      In the event of a breach or threatened breach of the Agreement by Lender or by me, Company may join me in any action against Lender without being first required to resort to or exhaust any rights or remedies against Lender.

4.      I represent that Lender is a duly qualified and existing corporation under the laws of its state of incorporation.  If Lender or its successors-in-interest should be dissolved or should otherwise cease to exist, or for any reason should fail, refuse or neglect to perform, observe or comply with the terms, covenants and conditions of the Agreement, I shall, at Company's election, be deemed to be employed directly by Company for the balance of the term of the Agreement upon the terms, covenants and conditions set forth therein.

5.      I will indemnify Company for and hold it harmless from and against any and all taxes which Company may have to pay and any and all liabilities (including judgments, penalties, fines, interest, damages, costs and expenses, including reasonable outside attorney's fees) which may be obtained against, imposed upon or suffered by Company or which Company may incur by reason of its failure to deduct and withhold from the compensation payable under the Agreement, any amounts required to be deducted and withheld from the compensation of any employee under the provisions of the Federal and State Income Tax Acts, the Federal Social Security Act, the California or any other state Unemployment Insurance Tax Act, and/or any amendments thereof and/or any other applicable statues heretofore or hereafter enacted requiring the withholding of any amount from the compensation of an employee.

6.      If Company shall serve Lender with any notices, demands or instruments relating to the Agreement, or to the rendition of my services thereunder, service upon Lender shall also constitute service upon me.

7.      For purposes of any and all Workers' Compensation statutes, laws or regulations ("Workers' Compensation"), I acknowledge that an employment relationship exists between Lender and me, Company being my special employer under the Agreement.  Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Workers' Compensation, my rights

and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Company or Company's affiliated companies and their respective officers, agents, and employees (including, without limitation, any other special employee and corporation or other entity furnishing to Company or an affiliate company the services of any such other special employee) shall be governed by and limited to those provided by Workers' Compensation.

_____
**BRUCE COHEN**

# EXHIBIT "CB"

This Exhibit is attached to and made part of the Agreement dated as of September 21, 2011, between SLP FILMS, INC. (herein, "TWC"), on the one hand, and BRUCE COHEN PRODUCTIONS (f/s/o BRUCE COHEN) ("Participant") relating to the motion picture project currently entitled "SILVER LININGS PLAYBOOK" (the "Picture").

## <u>NOTE:  PLEASE READ CAREFULLY</u>

**This Exhibit CB sets forth the contractual formula to be used solely for the definition, computation, and accounting of Contingent Proceeds and payment, if any, of Participant's Contingent Bonus as provided in the Agreement.**

**Participant understands and agrees that:  (i) the defined terms shall have the meanings described in this Exhibit CB; (ii) the words or defined terms used herein may not necessarily correspond in any way to generally accepted accounting principles or any other definitions associated with the practices of accounting or auditing; (iii) there is no guarantee whatsoever, and it is unlikely, that any Contingent Bonus will become payable to Participant, regardless of the level of income, revenues, profits and/or receipts, if any, that TWC, Affiliates or Related Parties, or any distributor or exhibitor realizes from the exploitation of the Picture; (iv) Participant shall be entitled to the payment of Contingent Bonus amounts only in accordance with the terms hereof, and Participant acknowledges and understands that any such payment is entirely speculative; (v) Participant has been represented by counsel or other representative(s) of their choice in the negotiation of the terms of the Agreement and this Exhibit CB; (vi) Participant has a full understanding of the terms of the Agreement and this Exhibit CB; (vii) TWC's, Affiliates' and Related Parties' accountings for financial reporting, tax reporting or other purposes are not prepared in the same manner as accountings pursuant to this Exhibit CB; (viii) no fiduciary relationship whatsoever exists between TWC and Participant, including without limitation, arising from the obligation of TWC to account for Contingent Proceeds and potentially to pay a Contingent Bonus to Participant; (ix) the terms of this exhibit are part of a comprehensive negotiated agreement that contains both economic and non-economic terms; and, which taken as a whole, is the product of an arm's length give and take negotiation whether or not changes have been made to this Exhibit CB; and (x) no representations whatsoever, expressed or implied, have been made to Participant that are contrary to this Paragraph.**

**Initialed: _____ (Participant)**

# CONTINGENT BONUS FORMULA

"Contingent Proceeds" shall mean the Defined Receipts, if any, remaining after TWC deducts and retains for its own account, the following items on a continuing basis in the following order of priority:

A.    **FIRST DEDUCTION** - First, an amount equal to the following percentages ("Percentage Deduction") of Defined Receipts:

- From Defined Receipts (other than Non-Theatrical; Flat Sales and TV)
  - o    U.S. and Canada                              35%
  - o    U.K.                                               35%
  - o    Other Foreign                                 40%

- Non-theatrical                                       50%

- From Flat Sales Defined Receipts           15%

- From TV Defined Receipts
  - o    U.S. Network                                   25%
  - o    U.S. Non-Network and Canada         40%
  - o    U.K. and Other Foreign                     40%

B.    **SECOND DEDUCTION** - Next, from the remaining amount of Defined Receipts, an amount equal to the Distribution Costs plus an additional 10% of Ad and Publicity Costs.

C.    **THIRD DEDUCTION** - Next, from the remaining amount of Defined Receipts, if any, whether or not funds are actually borrowed for the Picture, and irrespective of the actual funding arrangements or TWC's actual financing costs for the Picture or TWC's borrowing rate, as TWC's funding charge, an amount equal to 1.25 times the prime rate of the Bank of America, as the same may vary from time to time, on the total amount of the Fourth and Fifth Deductions below, commencing from the respective dates on which amounts chargeable under the Fourth or Fifth Deduction are paid or incurred (whichever first occurs) and continuing until the middle of the accounting period in which those amounts are recouped.

D.    **FOURTH DEDUCTION** - Next, from the remaining amount of Defined Receipts, if any, an amount equal to the Other Contingent Amounts.

E.    **FIFTH DEDUCTION** - Next, from the remaining amount of Defined Receipts, if any, an amount equal to the Cost of Production/Acquisition plus an additional 15% of Cost of Production/Acquisition and an additional 15% of cost of gross participations, each of which 15% shall be charged concurrently with the incurring of the respective items of Cost of Production/Acquisition.

The remaining amount, if any, shall be the Contingent Proceeds from which Participant's percentage or share thereof (the "Contingent Bonus") shall be calculated.

The terms used in this Contingent Bonus Formula are defined in, and the Contingent Bonus hereunder shall be accounted for, pursuant to the terms and conditions of the attached Schedule 1:

# SCHEDULE 1

## 1. DEFINITIONS

### 1.1. **Defined Receipts**

A. "Defined Receipts" means the aggregate of all receipts actually received by TWC on behalf of the Picture in U.S. dollars in the U.S. or in a foreign currency which are not Restricted Funds, only from:

1. TWC's direct distribution of the Picture in theatres and on television ("TV"), including theatrical and non-theatrical exhibitions and, free, cable and pay TV exhibitions.

2. Distribution of the Picture by a Subdistributor. With respect to distribution through Subdistributors the following alternative methods of calculation shall apply to the receipts derived therefrom and the distribution costs and fees relating thereto, whichever alternative TWC elects from time to time as to each such Subdistributor: Either (a) all such receipts received and earned by the Subdistributor, and all distribution costs of the Subdistributor relating to the Picture, to the extent reported to TWC, shall be treated as though such receipts were earned by TWC and such distribution costs were distribution costs of TWC, and the applicable TWC distribution fee shall include the Subdistributor's distribution fee; or (b) TWC's share of such receipts actually earned and received by TWC from such Subdistributor shall be included in Defined Receipts upon which share TWC shall be entitled to the applicable TWC distribution fee.

3. Manufacture and distribution of audio-visual cassettes, video discs and all electronic, digital and/or optical storage and/or transmission formats, any analog or digital reproductions, or any similar device and/or format embodying the complete Picture in linear form, whether now known or hereafter devised, which, for the sake of clarity, shall include "Video-On-Demand" (i.e., the Picture being available for display on any consumer viewing device of any nature, whether now known or hereafter devised, at a time selected by the viewer [as opposed to the viewer selecting a time from an exhibition schedule predetermined by an exhibitor or programming service], including, without limitation, by means of so-called video-on-demand and/or internet distribution) (collectively, "Video Devices"); provided that Defined Receipts for Video Devices sold by TWC or by any Subdistributor (whether or not an affiliate of TWC) whose revenues and distribution costs are treated as revenues and distribution costs of Company in accordance with paragraph 1.1.A.2., above, shall be: (A) 20% of (1) the "net wholesale receipts" (as defined below) actually received by Company or any such Subdistributor licensed by Company, from the exploitation of the Picture's home video rights for "rental priced" home videos actually sold and paid for and not returned (less rebates, credits

and taxes) and (2) sums actually received by Company through any so-called "revenue-sharing programs" involving all such Video Devices, computed after deducting from the total of such monies the deductible items set forth in (a) through (d) below and (B) 10% of (1) the net wholesale receipts actually received by Company or such Subdistributor from the exploitation of the Picture's home video rights for sell-through and repriced home video rights for sell-through and repriced home videos actually sold and paid for and not returned (less rebates, credits and taxes).

As used in this paragraph 1.1.A.3., the term "net wholesale receipts" shall mean the wholesale selling price derived from the sale at the wholesale level of Video Devices during the applicable accounting period, less the aggregate of the following items (prorated in accordance with the standard practice of TWC): (a) all adjustments such as returns and other credits, allowances, rebates and refunds, (b) deposits, advances and periodic payments until earned or forfeited, (c) sales, excise and remittance taxes, however denominated, and duties, (d) costs of marketing and advertising such Video Devices, and (e) subdistribution fees charged, not to exceed 5%.

4. "Flat Sale" licenses for the theatrical exhibition of the Picture for a specified period for any territory or area (excluding the U.S. and Canada) in consideration of the payment of a specified amount not calculated by a percentage of receipts of the applicable licensee.

5. Compensatory receipts (less all costs and fees) from copyright infringers of the Picture.

6. Receipts from theater box office operated by TWC in connection with four-wall or road show exhibitions of the Picture to the extent receipts from all such exhibitions taken as a whole exceed costs incurred for all such exhibitions.

7. The royalties as provided in Schedules A (Music) and B (Soundtrack Records, Merchandising/Publishing), which are attached hereto and incorporated herein by this reference. There will be no Percentage Deduction applied to the royalties under this subparagraph 7.

There shall not be any Percentage Deduction on Defined Receipts from Paragraph 1.1.A.5. If the respective costs relating to each of Paragraph 1.1.A.5, 1.1.A.6 or Paragraph 2 of Schedule B, and applicable Percentage Deduction, if any, pursuant to Paragraph 1.2, exceed receipts from each of Paragraph 1.1.A.5, 1.1.A.6 or Paragraph 2 of Schedule B, respectively, such excess costs of each shall separately be deductible as a Distribution Cost.

B. Defined Receipts Exclusions

The following are not included in Defined Receipts:

1.  Box office or other amounts retained by any theater or other exhibition venue (except as specified in Paragraph 1.1.A.6 hereof) for their own account; and receipts of: broadcasters and other transmitters by all means now known or hereafter devised; wholesale or retail distributors, licensors or sellers of Video Devices, audio devices and other products; book or music publishers; merchandisers and retailers; or any other similar Person, whether or not any or all such excluded Persons are owned, operated or controlled by TWC, Affiliates or Related Parties.

2.  Amounts received from advance payments or security deposits unless earned by exhibition or broadcast, or (subject to Paragraph 1.1.A.2) unconditionally non-returnable, and refunds, rebates or adjustments granted to other Persons by TWC.

3.  Amounts payable in foreign currency and not received by TWC in the U.S. due to remittance restrictions ("Restricted Funds"). Restricted Funds shall not be included in Defined Receipts nor accounted for unless and until they have been received by TWC in U.S. dollars in the U.S. or expended by TWC in the territory in which held, except as provided in 1.1.B.3(a) below.

(a) If any Contingent Bonus becomes payable to Participant under this Agreement, Participant may notify TWC in writing that Participant desires to have included in Participant's Contingent Bonus, Participant's share of Restricted Funds in a particular territory and designate a bank or other representative in such country, to whom payment may be made for Participant's account. Upon TWC's receipt of such notice and all required permissions, such payment shall be made to Participant's representative at Participant's expense. Upon payment of Participant's share of Restricted Funds, TWC shall have no further obligation to account for such Restricted Funds whether as Defined Receipts or otherwise.

(b) On Participant's written request, TWC shall report to Participant the amount of Restricted Funds (if any) which under this Paragraph 1.1.B.3 have not yet been included in Defined Receipts as of the closing date of the most recent statement which has been furnished to Participant under Paragraph 2.1 below.

4.  Amounts collected in connection with the distribution of the Picture as taxes or for payment of taxes (e.g., admission, sales, use or value added taxes, etc.).

5.  Amounts collected from exhibition of the Picture contributed to charitable organizations.

6.  Receipts from remakes, prequels, sequels, radio or TV series or other derivative uses of the Picture or any element thereof.

7.  Salvage value or receipts derived from print stocks, film or tape clips, stock footage, stills, props, sets, wardrobe, or other items included in Cost of Production/Acquisition except and only any sums received from the sale of cars purchased specifically in connection with the Picture and sold within six months after completion of photography, which sums shall be included in the Defined Receipts of the Picture without any Percentage Deduction.

1.2.  **Percentage Deduction**

"Percentage Deduction" means the percentage of Defined Receipts set forth in the Contingent Bonus Formula as the First Deduction which TWC shall deduct and retain for its own account.

1.3.  **Distribution Costs**

A.  "Distribution Costs" means the aggregate of all costs, expenses and charges paid, advanced or incurred by TWC or a Subdistributor (subject to TWC's election in Paragraph 1.1.A.2 above), directly or indirectly, in connection with the distribution, exhibition and exploitation of the Picture, which are not included in Cost of Production/Acquisition, including, without limitation, any of the following:

1.  Ad and Publicity Costs

Advertising, promoting, marketing, exploiting and publicizing (collectively "ad" or "advertising") in connection with the Picture, including the cost of ad space, time, and physical material used for ads and commercials; shipping, integrating and monitoring of ads and commercials; preparation and dissemination of ad material; audience testing and market research; salaries, fees, travel and business expenses of TWC advertising and marketing executives, personalities connected to the Picture, and publicists, press representatives and field exploitation persons appropriately allocated (in TWC's business judgment) to the Picture, whether or not incurred by or paid to TWC employees or other persons; previews, screenings, premieres, film festivals, trade shows and sales events; entertainment of press and personalities; research and tests of ad concepts and effectiveness; press books and kits, trailers, stills and other accessories and publicity releases; advertising allowances to theatres or other exhibitors regardless of how made; commercial tie ups; agency commissions; other advertising and publicity costs whether directed to the consumer or the exhibitor and institutional costs (collectively, "Ad and Publicity Costs").

2.  Conversion

Conversion to U.S. dollars and remittance of Defined Receipts to the U.S., including costs and fees of contesting the imposition of restrictions.

3.  Checking

Checking attendance and receipts, and investigating unauthorized use of the Picture, whether payable to or incurred by TWC employees or other Persons.

4.  Claims

All expenses, costs and attorneys' fees in connection with the investigation, assertion, prosecution or defense of claims or litigation relating to the Picture and the gross amount paid or reserved for the settlement or satisfaction of any claims, judgments or decrees in connection therewith.

5. Costs of Sales and Collections

Expenses incurred in connection with the licensing or sale of Picture for exhibition or for other uses, including without limitation, fees and commissions not otherwise provided for herein, duties and customs and expenses relating to four-wall engagements and expenses relating to collection of Defined Receipts including attorneys' and auditors' fees and costs, and liability incurred in connection therewith.

6. Copyright and Royalties

Copyright, trademark and patent costs in connection with the Picture and royalties payable with respect thereto, including without limitation, royalties payable to manufacturers of recording and reproducing equipment.

7. Other Versions

Preparing, making, delivering and using foreign, radio, TV, home video or any other media versions of the Picture, or titles thereof, or making changes required by censorship and rating considerations, or for any other purpose.

8. Residuals

All costs incurred and payments paid or payable, as required by applicable collective bargaining agreements, by reason of exhibition of the Picture or any part thereof in any media, or equivalent payments.  Any such payments made to or on behalf of Participant shall be deducted against Participant's Contingent Bonus (if any) to the extent not prohibited by the applicable collective bargaining agreement.  Any payments under this Exhibit CB made to Participant prior to payment of residuals shall constitute a credit against such residuals to the extent not prohibited by the applicable collective bargaining agreement; provided that any such credit, when applicable, shall not be taken a second time against Participant.

9. Insurance

Insurance coverage for any and all risks of loss or liability with respect to the Picture and any components thereof.  TWC may elect in its sole discretion to self-insure as to any items of risk, and charge an amount equal to the insurance premium TWC would otherwise have paid for such insurance.

10. Trade Dues/Piracy

The allocable portion, as determined in TWC's business judgment, of dues, assessments, legal fees and costs (including antitrust and piracy matters), and contributions to the MPAA, AMPTP or similarly constituted or substitute Persons throughout the universe.

11. Licenses

All licenses, duties, customs charges, fees or any other amounts in addition to those referred to herein incurred in connection with the licensing of the Picture for exhibition and other uses of the Picture.

12. Prints

Negatives, soundtracks, so called "virtual print" costs and other digital distribution costs, prints and other physical properties of the Picture including, without limitation, lab, labor, service and materials, titles, discs, dubbing, subtitling, gauge reductions, inspection, repair, shipping, storage, delivery and insurance thereon.

13. Taxes

Taxes and governmental fees of any nature and however characterized, including costs of contesting them, and interest and penalties thereon (other than TWC or Subdistributor corporate income taxes), imposed directly or indirectly on the Picture or any part thereof or on the Defined Receipts or the license, distribution or exhibition of the Picture, or collection, conversion or remittance of monies connected therewith.  Foreign remittance and withholding taxes charged to the Picture shall be determined as follows: the then-current effective tax rate for a particular country and distribution medium shall be multiplied by the Defined Receipts from such country and distribution medium.  TWC shall be entitled to claim and receive, and in no event shall Participant be entitled, directly or indirectly, to claim, share or participate in or otherwise receive or derive, any and all tax or other benefits of any kind or nature arising out of, in connection with or otherwise accruing in respect of any and all taxes (however denominated) described in this Paragraph 13, including, without limitation, any and all tax credits or deductions directly or indirectly attributable thereto or based thereon.  In no event shall Distribution Costs or Costs of Production/Acquisition be reduced, or Defined Receipts be increased, by the amount of any such tax (however denominated) recouped by TWC because of the manner in which such taxes are elected to be treated by TWC in filing net income, corporate, franchise, excess profits or similar tax returns.

14. Transportation, Shipping Packaging, etc.

Transportation, shipping, warehousing, reels and containers, destruction and all other costs of delivering the Picture for exhibition.

15. Reissue Costs

All costs directly related to the theatrical reissue of the Picture.

B. All discounts, rebates or credits received by TWC specifically relating to the Picture shall be taken into account in computing Distribution Costs hereunder other than those based on:  (i) volume or quantity of advertising, prints, negatives or other materials, or (ii) the manner or time of payment of any Distribution Cost item.

1.4. **Other Contingent Amounts**

"Other Contingent Amounts" means amounts such as deferments, defined receipts, contingent bonus (or similar payment), or otherwise, to any Person including Participant for rights or services in connection with the Picture, excluding:  (1) the Contingent Bonus payable to Participant or retained by TWC hereunder;  and (2) contingent bonus payments (or other contingent payments) which reduce Participant's Contingent Bonus to the extent provided   in this Agreement.  Other Contingent Amounts will be deducted if, when and to the

extent that TWC's obligation to pay them accrues, whether or not such payments have become due or been made and regardless of whether TWC has recovered the Cost of Production/Acquisition.

### 1.5. **Cost Of Production/Acquisition**

"Cost of Production/Acquisition" is the aggregate of all costs, charges, claims and expenses paid or incurred in connection with the development, production, funding and/or acquisition, post production and delivery of the Picture and its trailers, including payments required to be made following production of the Picture, determined in the customary manner TWC accounts for production and acquisition costs at the time the Picture is produced. If TWC's facilities are used, a use charge shall be included in the Cost of Production/Acquisition in accordance with the then-current TWC facilities charge schedule or actual cost. To the extent that TWC's contractual obligation to pay Defined Receipts to any Person, including Participant, for rights or services in connection with the Picture accrues before any Contingent Proceeds hereunder have been derived, such payments of Defined Receipts shall be deemed included in the Cost of Production/Acquisition regardless of whether the obligation is fixed or dependent upon Defined Receipts. If the Cost of Production/Acquisition of the Picture shall exceed the total cost reflected in the budget therefor approved by TWC by the lower of $300,000 or five percent (5%) of such approved budget (the "Cushion"), then, to compensate TWC for the additional financial risk it will have taken with respect to the Picture, there shall be added to and made a part of the Cost of Production/Acquisition a sum equal to the amount by which the Cost of Production/Acquisition exceeds the Cushion, but such excess overbudget amount shall not itself bear TWC's funding charge set forth as the Third Deduction in Paragraph C. of the Contingent Bonus Formula. Excess costs incurred due to force majeure, costs approved by a Business Affairs executive of TWC in writing, and retroactive increases to scale personnel under collective bargaining agreements are excluded from overbudget computation.

### 1.6. **Miscellaneous Definitions**

#### A. Non-Theatrical

"Non-Theatrical" means exhibition on airlines, ships, other transportation media, armed forces, V.A., Red Cross, schools, churches and similar institutional uses, etc.

#### B. Free TV

"Free TV" is as commonly understood in the industry.

#### C. Network

"Network" means ABC, NBC or CBS or any other similar affiliated group of Free TV television stations broadcasting more than fifteen hours of prime time programming per week with eighty percent U.S. clearance.

#### D. Includes

"Includes" (and equivalents "included" or "including") and "such as", are illustrative and not intended to be limiting.

#### E. Person

Any corporation, partnership or other business entity or natural person.

#### F. TWC

For the purposes hereof, "TWC" means The Weinstein Company and any owned or controlled subsidiaries of The Weinstein Company engaged in the business of theatrical, non-theatrical and television distribution of motion pictures. TWC shall not include: any theatrical exhibitor, radio or television transmitter or broadcaster; any satellite, cable or other pay television operator, nor any Person transmitting the Picture to such operators or any one else by any method or delivery system; any wholesale distributor or retailer of video discs, videocassettes or similar devices; any book or music publisher; any producer or distributor of audio products; any merchandiser; or any other similar Person, whether or not any of the foregoing excluded Persons are owned in whole or in part, operated or controlled by TWC.

#### G. Affiliate

For purposes of this Exhibit CB, "Affiliate" shall mean any entity (other than TWC) that is a subsidiary of The Weinstein Company (i.e., an entity of which The Weinstein Company owns, directly or indirectly through one or more intermediaries, more than 50% of the voting stock) and each other entity which, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, The Weinstein Company. For purposes of this definition, the terms "control," "controls," and "controlled" mean the power to direct the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise.

#### H. Related Party

For purposes of this Exhibit CB, "Related Party" shall mean any entity (other than an entity included in the definitions of TWC and Affiliate) which The Weinstein Company owns directly or indirectly through one or more intermediaries, more than 10% of the voting stock.

#### I. Subdistributor

A "Subdistributor" is a person other than TWC licensed by TWC for the distribution of the Picture with an obligation to report receipts and expenses to TWC. An Affiliate of TWC (other than owned or controlled subsidiaries) shall be deemed a Subdistributor if it distributes the Picture in one or more countries or media.

#### J. Territory

1. U.S. is the United States, together with any other countries licensed by or through the distributing organization(s) servicing the U.S. for TWC.

2. Canada is Canada, together with any other countries licensed by or through the distributing organization(s) servicing Canada for TWC.

3. The United Kingdom (U.K.) is United Kingdom of Great Britain and Northern Ireland, Republic of Ireland, Channel Islands, Isle of Man, Gibraltar, Malta.

4. Foreign is all countries (other than U.S., U.K. and Canada) and any other areas in the universe.

5. All foregoing references to countries include their territories and possessions, and political subdivisions.

6. Distribution to armed forces, airlines, ships and other means of transportation shall be included in the territory of their respective national origin.

K. Agreement

"Agreement" is the agreement to which this exhibit is attached, together with this exhibit, and any other attached amendments, exhibits and schedules.

## 2. ACCOUNTING

### 2.1. Statements

TWC shall give Participant quarterly summary statements relating to the calculation of Participant's Contingent Bonus for the first two years after the date established by TWC as the date of first general release of the Picture in the U.S. (or if there is no U.S. general release, then upon general release outside the U.S.); semiannually for the next two years; and annually thereafter if any Contingent Bonus is payable to Participant or, if none due, only on Participant's written request, provided such request is made not more than once per year. Statements shall be issued within 90 days after the end of each TWC accounting period and accompanied with payment of any amount shown due Participant. Notwithstanding the foregoing, if the Picture has been made available for U.S. TV syndication and the first statement thereafter issued shows that more than $500,000 in Defined Receipts would be needed before Participant would be entitled to receive Contingent Bonus, TWC shall have no further obligation to render statements to Participant. If the Picture is generally reissued in the U.S. theatrically, then TWC shall resume quarterly statements for one year from the date of such reissue and thereafter in accordance with the above.

### 2.2. Incontestability

Statements are subject to correction or amendment by TWC at any time. Should TWC make any overpayment to Participant hereunder for any reason, TWC shall have the right to deduct and retain for its own account an amount equal to any such overpayment from any sums that may thereafter become due or payable by TWC to Participant or for Participants' account, or may demand repayment from Participant in which event Participant shall repay the same when demand is made. Each statement and all matters of accounting and methodology are conclusive and binding on Participant 24 months after each statement is issued, unless Participant objects in writing within that 24 month period, specifying in detail the particular items on the statement and the nature of the objection(s). If the objections are raised timely, but are not resolved, Participant may initiate a claim with respect to such objections, provided such claim is instituted within 6 months following the date of the initial written objection or prior to the expiration of the period of

the applicable statute of limitations, whichever occurs first. Participant may not institute or maintain a claim against TWC with respect to any item or transaction on a statement, whether in a lawsuit, an arbitration or any other proceeding unless Participant has first provided TWC with a timely and detailed written objection to such item or transaction. TWC must keep books of account for any given transaction on a statement for 24 months after the initial reporting of such transaction. All time periods referred to in this paragraph commence upon issuance of the first statement on which any particular transaction is reflected, and the reappearance of a transaction in cumulative statements shall not cause the running of any time period to toll or recommence.

### 2.3. Books

The items reflected in the statements, to the extent they have not become incontestable or have not been previously examined, may be examined at Participant's expense, once in each 12 month period (the first of which commences upon issuance of the first statement hereunder). Such statements may only be examined by a national firm of reputable CPAs, the selection of which is subject to TWC's approval not to be unreasonably withheld. TWC shall make available for examination those books of account with respect to the distribution of the Picture. Each examination of any statement or statements for a particular accounting period must be concluded within the earlier of six months following commencement or an aggregate of 30 examination days. A copy of the report of such examination shall be delivered by Participant to TWC when it is made available to Participant. Participant shall have no right to inspect or copy any tax return of TWC or any Subdistributor, Affiliate or any Related Party, or require the production of any such tax return or any information contained therein.

### 2.4. Withholdings

All amounts payable to Participant under this Agreement shall be subject to all applicable present and future laws and regulations requiring the reporting, deduction or withholding of payments for taxes or otherwise. TWC shall have the right to make such deductions and withholdings, and the payment or reporting thereof to the governmental agency concerned in connection with TWC's good faith determination of such laws and regulations shall constitute payment hereunder to Participant. TWC shall not be liable to Participant for the making of, or the failure to make, such reports, deductions and/or withholdings or the payment thereof to the governmental agency concerned. In any such event, Participant shall have the sole responsibility for bringing and maintaining any claims against third parties regarding such reporting, deductions or withholdings.

### 2.5. Address

All statements shall be deemed issued when mailed to Participant at the address for notices under this Agreement.

### 2.6. Reserves

TWC shall have the right from time to time and in its business judgment to establish and adjust reserves for any distribution costs, uncollected accounts or other items

which TWC believes in its business judgment will be deductible from or credited against Defined Receipts hereunder. TWC agrees to liquidate reserves within an appropriate period of time within TWC's business judgment.

### 2.7. Tax Credits

TWC shall have the sole right to take whatever credits (including investment tax credits), deductions or other benefits that may be available throughout the universe, with respect to taxes and excises payable in any way in connection with the Picture or otherwise, without any accounting, credit or payment obligation to Participant.

## 3. ADDITIONAL TERMS

### 3.1. Arbitration

TWC and Participant agree that any dispute between them concerning the rights and obligations of TWC and Participant under this Exhibit CB, whether sounding in contract or tort, may only be adjudicated in accordance with the following procedure:

A. Either (i) TWC and Participant shall mutually select an arbitrator, or (ii) if they cannot agree on such arbitrator, TWC and Participant shall each select one arbitrator and those two arbitrators shall then select a third arbitrator.

B. The parties shall arbitrate the dispute in accordance with the then-prevailing arbitration rules of JAMS (except to the extent expressly set forth elsewhere in this Exhibit CB) and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

### 3.2. No Representation

TWC has no obligation to distribute the Picture and if it does so, Participant acknowledges that TWC has no obligation to maximize Defined Receipts and has not made any representations with respect to the likelihood or amount of Defined Receipts, deferments, Contingent Proceeds or Contingent Bonus, if any, which will or may be derived from distribution of the Picture.

### 3.3. Control of Exploitation and Marketing

A. As between TWC and Participant, TWC shall have exclusive and perpetual control of the distribution, marketing, advertising, publicizing, exploitation, sale or other disposition of the Picture and may distribute, or withhold or withdraw the Picture from distribution at its sole discretion with respect to one or more territories or media. TWC may distribute the Picture with other pictures whether or not TWC has any interest in such other pictures.

B. For all purposes under this Exhibit CB, allocations of Defined Receipts, costs, rights and other matters relating to the Picture and other motion pictures shall be allocated by TWC in its business judgment and in accordance with TWC's prevailing business practice.

C. With respect to trailers and shorts exhibited with the Picture outside of the U.S. and Canada, Defined Receipts shall be reduced by 3% for trailers and 5% for shorts.

D. As between TWC and Participant, TWC owns all rights to the Picture and its Defined Receipts and Contingent Proceeds, including the right to encumber, transfer or dispose of them and Participant shall have no right, title or interest therein. Participant acknowledges that its sole right under this Exhibit is a contractual right to contingent compensation in the form of, and measured by, the Contingent Bonus Formula.

E. TWC, its agents and assigns, in its and their business judgment, shall be entitled to distribute the Picture on a percentage basis or make flat sales, make and cancel contracts, adjust and settle disputes, and give allowances and rebates to distributors, licensees, exhibitors or other Persons whether or not any such entity is owned, operated or controlled by TWC, Affiliates or Related Parties.

F. TWC shall have complete discretion in determining the extent, if any, to which it will audit or check payments or charges to TWC or assert claims with respect thereto.

G. Participant acknowledges that TWC is part of a large, diversified international group of affiliated companies engaged in a variety of business activities. TWC has informed Participant that it frequently enters into business transactions with Affiliates and Related Parties, and Participant acknowledges and agrees that TWC is entitled (but is not obligated) to, and may, in its sole discretion, enter into agreements or other arrangements with Affiliates and Related Parties in connection with any or all rights relating to the Picture, including, without limitation, all exploitation rights and all subsidiary, ancillary or other rights relating thereto (the "Exploitation Rights"). Participant hereby acknowledges and agrees that TWC is under no obligation, express or implied, to offer the Exploitation Rights or any part thereof to unaffiliated or unrelated third parties, whether in lieu of or in addition to offering such rights to Affiliates and Related Parties, or to otherwise seek or secure any business arrangements with any unaffiliated or unrelated third parties with respect thereto. Without limiting the generality of any other provision of the Agreement, Participant hereby waives any right to make any claim or seek any relief, whether at law or in equity (specifically including injunctive relief), asserting the existence and/or breach of any such express or implied obligation.

In addition, Participant acknowledges and agrees that any agreement or other arrangement by TWC with an Affiliate or Related Party regarding the Exploitation Rights shall be conclusively presumed to be fair, reasonable and unobjectionable unless Participant shall establish that such agreement or other arrangement is on financial terms which, taken as a whole, are materially less favorable economically to TWC than the terms of Similar Transactions generally entered into by TWC with unaffiliated or unrelated third parties; or if there are no such unaffiliated or unrelated Similar Transactions, then by TWC with Affiliates or Related Parties (as applicable); or if there are no such Similar Transactions with Affiliates or Related Parties, then by Affiliates with any other Affiliate or Related Party (any such materially less favorable agreement or arrangement being hereinafter referred to as a "Less Favorable Arrangement"). For purposes hereof, the term "Similar Transactions" shall mean agreements or

other arrangements relating to motion pictures similar to the Picture (including TWC or non-TWC Pictures) which involve rights which are comparable to the Exploitation Rights or any relevant part thereof.    TWC and Participant agree that in any arbitration between them under Paragraph 3.1 above, concerning whether TWC has entered into a Less Favorable Arrangement, the arbitrator(s) shall select an independent national accounting firm with entertainment accounting expertise who shall be present with the arbitrator(s) during the arbitration proceedings, and, on the basis of the evidence presented (including any expert testimony presented by the parties and admitted into evidence), shall provide a written report to the arbitrator(s) solely on the issue of whether there was a Less Favorable Transaction; and the above referenced records and report shall be kept in strictest confidence by the accounting firm and disclosed only to the arbitrator(s) who shall have authority, subject to a protective order maintaining the confidentiality of the information to the fullest extent permitted by law, to disclose to the parties only those relevant portions of the report indispensable to the adjudication of the issue.  If pursuant to Paragraph 3.1 above, the arbitrator(s) conclude(s) that TWC has entered into a Less Favorable Arrangement with an Affiliate or Related Party, Participant's sole and exclusive remedy shall be the right to receive an adjustment on the next accounting statement when due, including any additional payments that may be required, pursuant to Paragraph 2.1 hereof, modified to the extent required to render such Less Favorable Arrangement not a Less Favorable Arrangement.

### 3.4.    Sales of All Rights

A.    If after completion and delivery of the Picture to TWC, TWC sells all its right, title and interest in the Picture (other than to an Affiliate or through merger or consolidation), Participant may elect that:

1.    The net sum received by TWC shall constitute Defined Receipts hereunder but further income of purchaser in connection with the Picture shall not be included in Defined Receipts, or,

2.    The net sum received by TWC shall not be included in Defined Receipts and all receipts and expenses (other than the purchase price paid to TWC) of the purchaser relating to the Picture shall be treated for purposes of accounting to Participant, as though they were receipts and expenses of TWC, provided that upon assumption by purchaser of such obligation, the sale shall be considered a novation and TWC shall thereafter have no obligation of any kind to Participant.

B.    Participant's election shall be made within 7 days after TWC notifies Participant in writing that it proposes to make such sale and identifies the purchaser and purchase price.  If TWC does not receive written notice of Participant's election within 7 days after issuance of TWC's notice, then TWC shall have the right, but not the obligation, to make such election on Participant's behalf.

### 3.5.    Assignment by Participant

A.    Participant may assign Participant's right to receive  its Contingent Bonus hereunder in whole or in part, at any time after the release of the Picture, subject to TWC's approval not to be unreasonably withheld and provided that such assignment does not subject TWC to any additional liability in connection with the assignment. However, in no event shall TWC be obligated to account to more than one Person. In any event, TWC's obligation to pay in accordance with any assignment, or designation of a disbursing agent, shall be conditioned on TWC's receipt of written notice thereof, in form satisfactory to TWC, and TWC's payment in accordance therewith shall satisfy TWC's payment obligations to Participant hereunder. Participant's right to examine TWC's books of account shall not be assignable without TWC's prior written consent, which consent may be withheld in TWC's sole discretion, and in any event shall be limited to one Person.

B.    TWC shall have the right of first refusal with respect to any proposed assignment of Participant's right to receive Contingent Bonus hereunder upon equivalent terms (to the extent economically matchable) offered to Participant by a bona fide third party.    Participant shall notify TWC of the terms of any such proposed assignment and TWC shall have 7 business days within which to elect to accept such terms.  Participant shall make no change in such terms which are adverse to Participant's interest without giving TWC the opportunity to accept such changed terms.  If TWC does not elect to accept such terms, then Participant shall be free to accept the proposed terms of assignment from such bona fide third party provided that if such proposed assignment is not concluded within 30 days following the expiration of the 7 business day period referred to above, TWC's right of first refusal under this Paragraph 3.5.B shall revive and shall apply to each subsequent offer received by Participant. This Paragraph 3.5.B shall not apply to family gifts.

### 3.6.    General Terms

A.    This Agreement is not for the benefit of any third party and shall not create a partnership, joint venture, agency, trust or fiduciary obligation between TWC and Participant or make Participant TWC's agent or create a relationship between TWC and Participant other than creditor-debtor to the extent amounts are due hereunder.

B.    TWC may, in its business judgment, commingle Contingent Proceeds or Defined Receipts with any other funds.

C.    Nothing in this Exhibit CB or the Agreement shall give Participant the right to a lien on the Picture, the Contingent Proceeds or Defined Receipts.

D.    Participant shall not be entitled to interest or any other gain which may accrue as a result of TWC's obligation to pay Participant's Contingent Bonus (or part thereof) even in the event of a dispute between Participant  and TWC concerning the interpretation of this Exhibit CB, non-payment hereunder or otherwise.

E.    Headings are for convenience only and are of no effect in construing the contents of this Agreement.

F.    Participant waives any right at law or equity to revoke, terminate, diminish or enjoin any rights granted or acquired by TWC hereunder by reason of a claimed

non-payment of monies allegedly due and payable hereunder, it being agreed that Participant's sole remedy for any such alleged non-payment shall be limited to a claim for any such money that is due and payable hereunder.

**END OF EXHIBIT CB**

**SCHEDULE "A"**
**REFERRED TO IN PARAGRAPH 1.1.A.7 OF EXHIBIT CB**

**MUSIC PUBLISHING**

1.   A royalty equal to sixteen-and-two-thirds percent (16⅔%) of Music Publishing Contingent Proceeds ("MPCP") received by TWC from the exploitation of music publishing rights (i.e., mechanical reproduction, public performance, sheet music/folios and synchronization) to the original music and/or lyrics written specifically for and synchronized in the Picture as generally released (the "Music") shall be included in Defined Receipts.

2.   Music Publishing Defined Receipts ("MPDR") shall mean all monies actually received by TWC with respect to the Music excluding any advance, guarantee or minimum royalty payment received by TWC in connection with any subpublishing, collection, licensing or other agreement, unless such payment is specifically attributable to the Music.

3.   MPCP shall mean MPDR less the following:

   (a)   Ten percent (10%) of MPDR, as an administration fee to TWC.

   (b)   Royalties or other monies payable by TWC to the composer(s) and/or lyricist(s) of the Music.

   (c)   All additional shares of MPDR payable by TWC to such composer(s), lyricist(s) and/or any other third party co-publishers, administrators or other participants.

   (d)   Collection or other fees customarily and actually charged by The Harry Fox Agency, Inc., or any other collection agent  used by TWC.

   (e)   Copyright registration fees and the costs of transcribing  lead sheets.

   (f)   All other administration and exploitation expenses incurred with respect to the Music including, without limitation, the costs of producing demonstration records, advertising and promotion expenses, costs or amounts payable to third-party publishers, co-publishers, administrators, publishing participants, subpublishers, licensees, trustees or collection agents, attorneys' and accountants' fees directly related to the Music, and damages and expenses incurred by reason of infringement claims, but excluding rents, overhead, salaries and other similar general expenses.

4.   If Participant is entitled to receive a direct royalty or other type of payment with respect to the Music, then no portion of MPCP will be included in Defined Receipts.

**THE WEINSTEIN COMPANY**
**MUSIC PUBLISHING**
**SCHEDULE "A" TO EXHIBIT CB**

**SCHEDULE "B"**
**REFERRED TO IN PARAGRAPH 1.1.A.7 OF EXHIBIT CB**


1.     **SOUNDTRACK RECORDS**:  In the event TWC receives any royalties in respect of the soundtrack album(s) ("Album") and/or other  "phonorecords" (as that term is defined in the U.S. Copyright Act of 1976, 17 U.S.C. Sections 101, et. seq.) derived from the soundtrack of the Picture ("Soundtrack Records"), then TWC agrees that such royalties will be computed as follows for inclusion in Defined Receipts:

       1.1     If an Affiliate distributes Soundtrack Records, then the royalty included in Defined Receipts shall equal 2½% ("Royalty Rate") of 90% of the suggested retail list price (or the equivalent wholesale royalty) for net sales of the Album through normal retail channels in the United States ("USNRC Sales").  The Royalty Rate shall be defined, computed, reduced and accounted for on the same basis that the Affiliate customarily accounts to third party recipients including, without limitation, in respect of foreign sales, configurations variations, taxes, flat fee licensing, coupling, singles, free goods, packaging deductions, royalty base and all other reductions and deductions.  Royalties hereunder shall only be included in Defined Receipts prospectively after the recoupment from the aggregate royalty payable (or accrued against advances or other charges) by TWC in respect of Soundtrack Records (including royalties payable to artists, producers, record companies, film personnel, music supervisors, musicians and the royalty payable pursuant to this Schedule B) of the following:     (i) all recording costs of the master recordings embodied in Soundtrack Records; (ii) any re-recording costs of master recordings which are re-recorded for Soundtrack Records; and (iii) all costs of converting the master recordings in the Picture from motion picture recordings to phonograph record use (including, re-recording costs, reuse fees, editing, sweetening, etc.).

       1.2     In the event that TWC receives its royalties from the exploitation of Soundtrack Records by a third party distributor, then the royalty to be included in Defined Receipts shall be the "Soundtrack Contingent Proceeds" (as defined below).

       1.3.     "Soundtrack Contingent Proceeds" shall mean all revenues received by TWC from the exploitation of Soundtrack Records, if any, as set forth in the applicable Soundtrack Records agreement after deduction of the following costs and third party royalties:

               (a)     A sum equivalent to the actual dollar amount (including any fixed cash amounts, advances and/or royalties) actually paid to all third party performers and/or participants with respect to the music/soundtrack contained in Soundtrack Records and/or the Picture, including without limitation, cash payments and/or royalties payable to artists, producers, record companies, film personnel, music supervisors and musicians.

               (b)     A sum equivalent to all artwork costs for Soundtrack Records to the extent such artwork costs are paid by or charged to TWC, remixing and remastering costs, re-recording costs, reuse fees, license fees and similar costs attributable to the recording/production and/or licensing of the master recordings embodied on Soundtrack Records, except to the extent such costs are included in the negative cost of the Picture and to the extent such Soundtrack Records costs and fees have actually been incurred directly or indirectly by TWC.

               (c)     Any legal fees or related expenses incurred for outside legal counsel engaged at TWC's election to: document and/or negotiate the applicable Soundtrack Records agreement; in protecting or defending TWC's rights, privileges and benefits with respect to Soundtrack Records and/or any master recordings recorded/acquired for the Picture and/or Soundtrack Records; and/or in connection with any dispute involving any release/distribution agreement pertaining to Soundtrack Records.

               (d)     In the event the Soundtrack Records distributor pays TWC any nonreturnable advance against royalties, a reasonable reserve shall be applied towards (i) third party payments payable prior to the Soundtrack Record distributor's recoupment of such advance at the "net" artist rate; and (ii) unrecouped costs

incurred in respect of any Soundtrack Records and/or in excess of the budgeted cost of the music for the Picture.

1.4.    Notwithstanding the foregoing, no royalties shall be included hereunder for any so-called "storyteller" or "read-along" phonorecords or for any phonorecords embodied in other merchandise or for any audiovisual devices now known or hereafter devised.

1.5.    If Participant is entitled to receive a direct royalty or other type of payment with respect to Soundtrack Records, then no royalties from Soundtrack Records will be included in Defined Receipts.

2.    <u>MERCHANDISING/PUBLISHING</u>.  With respect to items of merchandising (including interactive games and other products and services) and book publication (including children's storytelling recordings, as distinguished from soundtrack records, but excluding souvenir programs and similar publications) based on the Picture, then:

2.1    For items sold by a licensee of TWC (which licensee may be an Affiliate), the royalties TWC receives from such licensee shall be included in Defined Receipts of the Picture after first deducting (i) a percentage deduction of:  fifty percent (50%), inclusive of subdistributor fees, for items sold in the U.S.; sixty-five percent (65%), inclusive of subdistributor fees, for items sold outside the U.S.; and fifteen percent (15%) plus any subdistributor's fees for any book novel; and (ii) out-of-pocket costs, sales agent fees and royalties to third parties; or

2.2    For items sold by TWC (other than Affiliates acting as licensees of TWC under paragraph 2.1, above) at the wholesale or retail level, at TWC's discretion, either:  (i)  an amount equal to seven (7%) of the wholesale price of such items sold by TWC at the wholesale level (less a reasonable allowance for returns); or (ii)  an amount equal to seven percent (7%) of fifty percent (50%) of the gross retail revenues of such items sold by TWC at the retail level (less a reasonable allowance for returns) shall be included in Defined Receipts of the Picture after first deducting (a) a percentage deduction of fifty percent (50%) for items sold in the U.S.; sixty-five percent (65%) for items sold outside the U.S.; and fifteen percent (15%) with respect to any book novel; and (b) out-of pocket costs, sales agent fees and royalties to third parties.

2.3    In no event shall any items of merchandise be treated as falling under both provisions 2.1 and 2.2 above.

2.4    If Participant is entitled to receive a direct royalty or other type of payment with respect to the exercise of merchandising and book publication rights, then no royalties therefrom will be included in Defined Receipts.

<div align="center">

**THE WEINSTEIN COMPANY**
**SOUNDTRACK RECORDS/MERCHANDISING/PUBLISHING**
**SCHEDULE "B" TO EXHIBIT CB**

</div>

**RIDER TO EXHIBIT "CB"**

This Rider is attached to and made a part of Exhibit "CB" which is attached to the agreement ("Agreement") dated as of September 21, 2011, between SLP FILMS, INC. (herein, "TWC"), on the one hand, and BRUCE COHEN PRODUCTIONS (f/s/o BRUCE COHEN) ("Participant") relating to the motion picture project currently entitled "SILVER LININGS PLAYBOOK" (the "Picture").

1.       With respect to Paragraph A. of the Contingent Bonus Formula (FIRST DEDUCTION), the following shall be added thereto as the last sentence thereof:  "As to any medium or means of exploitation not currently in general use, the applicable Percentage Deduction applied shall be consistent with that customarily applied by TWC in general with respect to such respective medium and/or means of exploitation."

2.       With respect to Paragraph B. of the Contingent Bonus Formula (SECOND DEDUCTION), the following new sentence shall be added at the end of the paragraph: "There shall be included in such additional 10% of Ad and Publicity Costs the salaries and fees of any such advertising or marketing executives of TWC, but this is not to be construed as including other salaries or fees in said additional 10% charge, such as salaries of the publicist in charge of publicity for the Picture, and of regular employees of TWC rendering services in connection with field exploitation and salaries and fees of special publicists and advertising personnel.  Also included in said additional 10% charge are costs of utilities, local telephone, office copying, duplicating machines and other institutional costs at the office of TWC.

3.       With respect to the Paragraph B. of the Contingent Bonus Formula (SECOND DEDUCTION), if Participant's percentage or share of Contingent Bonus pursuant to the Agreement is an amount of adjusted Defined Receipts after an Initial Contingent Proceeds Startpoint, expenses that may have been deducted in reaching such Initial Contingent Proceeds Startpoint may not again be deducted (i.e., no double deductions) from Defined Receipts after such Initial Contingent Proceeds Startpoint to calculate adjusted Defined Receipts.  In addition, if an expense item is limited by this Rider, when the limit is reached for one purpose, it is reached for all purposes.

4.       With respect to Paragraph D. of the Contingent Bonus Formula (FOURTH DEDUCTION), the words "actually earned or paid" shall be inserted after the word "Amounts."

5.       With respect to Paragraph 1.1.A. (DEFINITIONS, DEFINED RECEIPTS), the words "or credited to" shall be inserted immediately after the word "by" in the second line.

6.       With respect to Paragraph 1.1.A.2. (DEFINITIONS, DEFINED RECEIPTS), Subdistributors hereunder shall be deemed to include TWC sales agents (if any).

7.    With respect to Paragraph 1.1.A.3. (DEFINITIONS, DEFINED RECEIPTS), the words "or more than 50% of the Picture" shall be inserted immediately after the word "Picture" in the sixth line.  In addition, the following shall be added thereto:  "There shall be no duplication of charges for the cost of manufacturing such Video Devices under this Paragraph 1.1.A.3. in Paragraph 1.3.A.7. hereof (i.e., any item charged under one paragraph may not again be charged under the other) and to the extent an Affiliate is distributing same, and in any instance where Participant is accounted to on a royalty basis, it is understood that said Affiliate shall pay for the cost of manufacturing and mastering its Video Devices, and all artwork, advertising, exploitation and other distribution costs and such costs shall not be deducted from the royalty remitted to Participant or under Paragraph 1.3.A.7. of Exhibit CB.  For purposes of clarification, the foregoing does not affect TWC's contractual right to deduct residuals and taxes in connection with Video Devices as provided for in the exhibit to which this rider is attached".

8.    With respect to Paragraph 1.1.A.5. (DEFINITIONS, DEFINED RECEIPTS), the words "excluding costs of TWC in-house counsel in connection with such copyright infringement claims" shall be inserted immediately after the word "costs" but within the parenthetical; and the words "unfair competition, trademark, and/or patent infringement and/or defamation claims" shall be inserted immediately after the word "infringers."

9.    With respect to Paragraph 1.1.A.5. (DEFINITIONS, DEFINED RECEIPTS), the phrase "or similar causes of action (e.g., trademark, commercial appropriation)" shall be inserted at the end of the item, and there shall be no Percentage Deduction thereon.

10.    With respect to Paragraph 1.1.A.6. (DEFINITIONS, DEFINED RECEIPTS), the following shall be added at the end: "; provided, however, that the share of box office receipts retained by or allowed to such theater shall not exceed the amount which would have been retained by, or allowed to such theater had such theater not been owned, operated, managed or controlled by TWC, its affiliates or subsidiaries."

11.    With respect to Paragraph 1.1.A.7 (DEFINITIONS, DEFINED RECEIPTS), the words "and other receipts" shall be inserted immediately after the word "royalties" in the first line.

12.    With respect to Paragraph 1.1.A.7. (DEFINITIONS, DEFINED RECEIPTS) and Paragraph 2. of Schedule "B" (MERCHANDISING/PUBLISHING), no costs of manufacture, advertising or shipping related to the sale or distribution of merchandise items shall be deducted.

13.    With respect to Paragraph 1.1.A. (DEFINITIONS, DEFINED RECIEPTS), the following are added as new Paragraphs 8. and 9. thereof: "8. Receipts from the distribution of trailers for the Picture; and 9. Receipts allocable to the Picture as received from the Copyright Tribunal or similar bodies."

14.     With respect to Paragraph 1.1.A. (DEFINITIONS, DEFINED RECEIPTS), the following is added as new subparagraph 10:

"10.     If and to the extent TWC's general custom and practice with respect to calculating, defining and accounting for royalties or receipts (if any) from the new technology currently known as 'video-on-demand' (whether by internet delivery or otherwise), differs from the method of calculating, defining and accounting for such royalties and receipts (if any) set forth in Paragraph 1.1.A.3. of this Exhibit CB, then such royalties and receipts (if any) shall be calculated, defined and accounted for in accordance with TWC's general custom and practice in general with respect to such 'video-on-demand' exploitation at the time of any such exploitation."

15.     With respect to Paragraph 1.1.B.2. (DEFINITIONS, DEFINED RECEIPTS EXCLUSIONS), the words "unconditionally non-returnable" in the fourth line shall be deemed deleted and the words "forfeited or non-returnable, subject to adjustment and settlement," shall be inserted in place of such deletion.

16.     With respect to Paragraph 1.1.B.3. (DEFINITIONS, DEFINED RECEIPTS EXCLUSIONS), after the word "TWC" in the seventh line, the words "for any purpose" shall be inserted; and the following shall be added at the end of the Paragraph, "or unless freely remittable to the U.S. in U.S. dollars. There shall be no unreasonable delay with respect to the conversion and remittance of foreign receipts hereunder."

17.     With respect to Paragraph 1.1.B.5. (DEFINITIONS, DEFINED RECEIPTS EXCLUSIONS), the words "any charitable screening" shall be inserted immediately after the word "from" in the first line.

18.     With respect to Paragraph 1.1.B.7. (DEFINITIONS, DEFINED RECEIPTS EXCLUSIONS), the words "or such other major items" shall be inserted immediately after the word "cars" in the fifth line.

19.     With respect to Paragraph 1.1.B.7. (DEFINITIONS, DEFINED RECEIPTS EXCLUSIONS), the following shall be added thereto: "and shall for purposes of the funding charge set forth in the Paragraph C. of the Contingent Bonus Formula and the additional 15% charge set forth in Paragraph E. of the Contingent Bonus Formula, reduce the Cost of Production/Acquisition of the Picture on the same basis as originally charged.

20.     With respect to Paragraph 1.1.B (DEFINITIONS, DEFINED RECEIPTS EXCLUSIONS), the following shall be added as a new subparagraph 8.: "8. Cash receipts (if any) from the appearance of products in the Picture; provided that such cash

receipts, if any, shall be applied to reduce the Cost of Production/Acquisition (under Paragraph 1.5. below)."

21.    With respect to Paragraph 1.3.A. (DEFINITIONS, DISTRIBUTION COSTS), the following is inserted immediately after the word "Subdistributor" in the third line: "solely to the extent TWC bears or otherwise accepts such Subdistributors costs and expenses."  The following is inserted immediately after the word "following" in the eighth line:  "(subject to credit for any volume discounts received as a result of TWC motion picture operations only as opposed to as a result of any TWC operations and/or business other than motion picture operations, but Participant shall have no audit rights with respect to any such discounts)."

22.    With respect to Paragraph 1.3.A.1. (DEFINITIONS, DISTRIBUTION COSTS, AD AND PUBLICITY COSTS), the words "and reasonably," shall be inserted immediately after the word "appropriately" in the eleventh line.

23.    With respect to Paragraph 1.3.A.1. (DEFINITIONS, DISTRIBUTION COSTS, AD AND PUBLICITY COSTS), the words "related to the Picture" shall be inserted immediately after the word "costs" in the twenty-first line.

24.    With respect to Paragraph 1.3.A.3 (DEFINITIONS, DISTRIBUTION COSTS, CHECKING), the following shall be added thereto:  "Any and all checking costs shall be appropriately allocated to the Picture and shall not exceed one percent (1%) of the worldwide Defined Receipts of the Picture.  Also, there shall be no charge made for checking by TWC employees, other than with respect to four walls, road shows or other special extenuating circumstances."

25.    With respect to Paragraph 1.3.A.4. (DEFINITIONS, DISTRIBUTION COSTS, CLAIMS), the word "reasonable" shall be inserted immediately after the word "and" in the first line.

26.    With respect to Paragraph 1.3.A.4. (DEFINITIONS, DISTRIBUTION COSTS, CLAIMS), the following shall be added thereto:  "Any and all amounts deducted pursuant to this Paragraph 1.3.A.4. must be reasonably allocated to the Picture.  Additionally, there shall be no deduction for costs respecting any defense, settlement or judgment of anti-trust claims and no deduction for attorney fees with respect to any litigation matter between TWC and Participant that results in a final judgment on the merits in Participant's favor."

27.    With respect to Paragraph 1.3.A.4. (DEFINITIONS, DISTRIBUTION COSTS, CLAIMS), attorneys' fees shall be limited to outside counsel; provided however, this language shall not preclude TWC from charging appropriate fees for in-house production-related legal services.  Amounts deductible in connection with claims shall be net of insurance recoveries, recoveries from third parties pursuant to indemnification and recoveries from counterclaims or cross-claims in the same action.  A third party participation granted as a result of a final judgment or settlement of a claim in connection

with the Picture shall be treated as "Other Contingent Amounts" under Paragraph 1.4., and shall not be treated as a Distribution Cost under Paragraph 1.3.

28.　With respect to Paragraph 1.3.A.4. (DEFINITIONS, DISTRIBUTION COSTS, COSTS OF SALES AND COLLECTIONS), the word "outside" shall be inserted immediately after the word "including" in the sixth line and also immediately after the word "and" in the sixth line.

29.　With respect to Paragraph 1.3.A.5. (DEFINITIONS, DISTRIBUTION COSTS, COST OF SALES AND COLLECTIONS), the following shall be added as the last sentence thereof:  "The foregoing charges shall not be deemed to limit TWC's right to charge in-house legal production services as a Cost of Production/Acquisition."

30.　With respect to Paragraph 1.3.A.8. (DEFINITIONS, DISTRIBUTION COSTS, RESIDUALS), the third sentence thereof beginning with the word "Any" and ending with the word "Participant" shall be deleted.

31.　With respect to Paragraph 1.3.A.9. (DEFINITIONS, DISTRIBUTION COSTS, INSURANCE), the following sentence is added at the end thereof: "Any net insurance recovery for an item included in Cost of Production/Acquisition, or as an item of Distribution Costs (as applicable) shall be applied to reduce the Cost of Production/Acquisition, or as an item of Distribution Costs (as applicable) shall be applied to reduce the Cost of Production/Acquisition under Paragraph 1.5., or the Distribution Costs under Paragraph 1.3., as applicable.  TWC agrees not to deduct as a distribution cost any reserve against a loss for which TWC has elected to self insure and has charged a self insurance premium equivalent as a distribution cost hereunder.  In the event TWC elects to self-insure and charges a premium as part of the Cost of Production/Acquisition, then upon the occurrence of the insurable event, TWC shall within a reasonable time reduce the Cost of Production/Acquisition of the Picture by an amount equal to an amount an insurance company charging a like premium would have paid to TWC with respect to such insurable event."

32.　With respect to Paragraph 1.3.A.10. (DEFINITIONS, DISTRIBUTION COSTS, TRADE DUES/PIRACY), the following sentence is added to the end of this paragraph:  "Notwithstanding the foregoing, Defined Receipts shall not be reduced by more than: (1) $250,000 in the aggregate for domestic trade association fees payable by TWC to M.P.A.A., A.M.P.T.P. and/or any similarly constituted or substitute person or successor organization to which TWC may now or hereafter belong on account of receipts or proceeds from the distribution of the Picture; and (2) $250,000 in the aggregate for foreign trade association fees payable by TWC to the M.P.E.A. and/or any successor organization to which TWC may now or hereafter belong on account of receipts or proceeds from the distribution of the Picture.

33.　With respect to Paragraph 1.3.A.12 (DEFINITIONS, DISTRIBUTION COSTS, PRINTS), the following shall be added as the last sentence thereof:  "Such costs shall not include the costs for mastering, artwork or duplication of Video Devices of the

Picture for commercial distribution.  Also, the allocable and proportional share of any lab rebates for print costs (to the extent related to the Picture) shall be credited to lab print costs for the Picture, but Participant shall have no audit rights with respect to any such rebates."

34.    With respect to Paragraph 1.3.A.13. (DEFINITIONS, DISTRIBUTION COSTS, TAXES), the words "(appropriately allocated)" shall be inserted immediately after the word "nature" in the first line; and the following shall be added as the last sentence thereof: "In the event of any tax refunds and/or in the event of any interest adjustment, Distribution Costs shall be credited (without any Percentage Deduction taken) with respect thereto."

35.    With respect to Paragraph 1.3.A.13. (DEFINITIONS, DISTRIBUTION COSTS, TAXES), the following sentence is added at the end of the paragraph: "The words 'corporate income taxes' appearing herein shall mean taxes based on net income, so-called excess profits, and, to the extent such are in the nature of taxes based on the net income or so-called excess profits taxes – franchise and corporation taxes.  Also, to the extent any such taxes paid by TWC are deducted and subsequently refunded, an appropriate retroactive adjustment in Distribution Costs shall be made."

36.    With respect to Paragraph 1.3.A. (DEFINITIONS, DISTRIBUTION COSTS), a new Paragraph 16. shall be added as follows:  "16.  Charging of Production/Distribution Costs.  Any item charged as a Distribution Cost pursuant to Exhibit CB cannot again be charged as a Cost of Production/Acquisition pursuant to this Exhibit CB and vice versa; nor shall any item of Distribution Cost, Cost of Production/Acquisition, Percentage Deduction, or Other Contingent Amounts be charged more than once."

37.    With respect to Paragraph 1.4 (DEFINITIONS, OTHER CONTINGENT AMOUNTS), the words "a financier which only provides financing for the Picture and does not provide producing or other services or" shall be inserted immediately prior to the word "Participant" in the sixth line.

38.    With respect to Paragraph 1.4 (DEFINITIONS, OTHER CONTINGENT AMOUNTS), the following shall be added thereto as the last sentence: "Notwithstanding anything to the contrary hereinabove, Contingent Proceeds participations to others shall not be deducted in computing Participant's Contingent Bonus hereunder; provided, however, the foregoing shall not be deemed a limitation of TWC's right to reduce Participant (if Participant's Contingent Bonus is reducible), it being further provided that if Participant's Contingent Bonus is reducible by third party participations under the Agreement to which this Exhibit is attached, such third party participations which are used to reduce Participant's Contingent Bonus shall not also be deductible hereunder (i.e., no double reduction/deduction)."

39.    With respect to Paragraph 1.5 (DEFINITIONS, COST OF PRODUCTION/ACQUISITION), the words "(but not Contingent Bonuses or Contingent

Proceeds deferments)" shall be inserted immediately after the word "Receipts" in the thirteenth line.

40.    With respect to Paragraph 1.5 (DEFINITIONS, COST OF PRODUCTION/ACQUISITION), the following shall be added after the word "Receipts" in the nineteenth line:  "; provided, however, that the funding charge set forth in the Third Deduction in Paragraph C. of the Contingent Bonus Formula and the additional 15% charge set forth in the Fourth Deduction in Paragraph D. of the Contingent Bonus Formula shall not be charged on participations payable out of Defined Receipts prior to Contingent Proceeds becoming payable hereunder.  No item of Cost of Production/Acquisition will be again charged as a Distribution Cost., or vice versa."

41.    With respect to Paragraph 1.5 (DEFINITIONS, COST OF PRODUCTION/ACQUISITION), the figure of "$300,000" in the twenty-second line thereof is deleted therefrom and the figure "$500,000" is substituted therefore.  Excess costs incurred due to losses to TWC which are reimbursed by net insurance recoveries are also excluded.

42.    With respect to Paragraph 1.5 (DEFINITIONS, COST OF PRODUCTION/ACQUISITION), the following is added thereto:  "Net insurance recoveries by TWC on items actually charged as a Cost of Production/Acquisition shall be credited to Cost of Production/Acquisition accordingly."

43.    With respect to Paragraph 1.6.J.1. (DEFINITIONS, MISCELLANEOUS DEFINTIONS, TERRITORY), the following words shall be added thereto:  "and all transportation companies, armed services or institutions flying the flag of the U.S."

44.    With respect to Paragraph 2.1. (ACCOUNTING, STATEMENTS), "$500,000" shall be changed to "$750,000" in the seventeenth line; and, the following shall be added after the word "Participant" in the twentieth line: "; provided, however, TWC will provide Participant with no more than one statement per year upon Participant's written request."

45.    With respect to Paragraph 2.1. (ACCOUNTING, STATEMENTS), the following is added to the last sentence thereof:  "and if, in the first U.S. free television window in the U.S., the Picture is broadcast on prime time network television in the U.S. or exhibited on HBO/Cinemax, Showtime/The Movie Channel,  The Disney Channel or similar pay cable stations, TWC shall account therefor by issuing a quarterly statement for one year starting on the accounting period within which the Picture has been so exhibited, accompanied by payment of the amount, if any, shown thereby to be due Participant."

46.    With respect to Paragraph 2.2. (ACCOUNTING, INCONTESTABILITY), the number "36" shall be substituted for the numeral "24" in each place therein.

47.     With respect to Paragraph 2.2. (ACCOUNTING, INCONTESTABILITY), the following shall be inserted immediately after the word "objection" in the nineteenth line: "(or if an audit is commenced before and completed on a timely basis after said 36 month period, then Participant may initiate a claim within 6 months after completion of such audit)."

48.     With respect to Paragraph 2.2. (ACCOUNTING, INCONTESABILITY), the following sentence shall be inserted immediately after the sentence ending with the word "first" in the twentieth line:  "The foregoing period within which Participant may raise objections shall recommence, but only with respect to certain transactions or items included in previous statements that have been thereafter revised and/or corrected."

49.     With respect to Paragraph 2.2 (ACCOUNTING, INCONTENSABILITY), the time periods provided shall be extended to a period equal to any period of time during which an examination of TWC's records is occurring, plus, if there are less than six months remaining in the period provided, an additional period of six months thereafter.

50.     With respect to Paragraph 2.3. (ACCOUNTING, BOOKS), the word "national" is deleted from the seventh line, and the following sentence shall be inserted immediately after the word "withheld" in the ninth line: "The 'big eight' accounting firms excluding Price Waterhouse are pre-approved by TWC subject to any conflict of interest that may arise."

51.     With respect to Paragraph 2.4. (ACCOUNTING, WITHHOLDINGS), if the Contingent Bonus payable to Participant pursuant to this Agreement shall exceed that permitted by any law or governmental regulation, the Contingent Bonus shall be reduced to the maximum permitted payment.  TWC shall assist (but shall not be required to incur any expense or liability to itself) Participant in the application to the appropriate authority for the right to pay Participant all of the proceeds payable to Participant pursuant to the Agreement.  If TWC is in possession of such proceeds at such time, TWC shall pay the difference between the proceeds payable pursuant to the Agreement and the proceeds previously permitted to be paid, at such time, if ever, as it may be legally permissible for TWC to pay such difference.

52.     With respect to Paragraph 2.6. (ACCOUNTING, RESERVES), the following shall be added thereto:  "TWC shall not be entitled to establish any reserve for residuals unless the statement on which such reserve is established reflects receipt of Defined Receipts which would result in TWC's obligation to pay said residuals.  In any event, TWC shall liquidate any such reserves within 12 months after establishing the same unless there is any claim and/or litigation pending, in which case TWC may continue to maintain such reserves."

53.     With respect to Paragraph 3.1.A. (ADDITIONAL TERMS, ARBITRATION), subparagraph A. shall be deemed deleted in its entirety and the following inserted in its place:

"A.    TWC and Participant shall attempt in good faith to mutually select an arbitrator experienced in motion picture accounting matters (and in so doing, may, without obligation, use an American Arbitration Association list of qualified arbitrators).  If TWC and Participant are unable to mutually agree on an arbitrator within two (2) weeks, then TWC and Participant shall, within the subsequent one (1) week period, each select one arbitrator; and within the next subsequent one (1) week period, those two arbitrators shall then select a third arbitrator."

54.    With respect to Paragraph 3.1.B. (ADDITIONAL TERMS, ARBITRATION), the following shall be inserted in the last three sentences thereof:  "If the award rendered by the arbitrator(s) exceeds TWC's last settlement offer to Participant by more than 20%, the TWC shall reimburse Participant for Participant's reasonable outside attorney and accounting fees in connection with such arbitration procedure.  If the award rendered by the arbitrator(s) is less than 80% of TWC's last settlement offer to Participant, then Participant shall reimburse TWC for TWC's reasonable outside attorney and accounting fees in connection with the arbitration procedure.  If the award is between 20% less than and 20% more than TWC's last settlement offer to Participant, then the arbitrator(s) may award reasonable outside attorney and accounting fees in connection with the arbitration as the arbitrator(s) deems appropriate in the exercise of such arbitrator(s)'s discretion.

55.    With respect to Paragraph 3.1.B. (ADDITIONAL TERMS, ARBITRATION), the following shall be deemed added thereto:  "The prevailing party in the arbitration shall be reimbursed by the other party for the prevailing party's share of American Arbitration Association administration fees, any arbitrator compensation and any rental fees for arbitration hearing rooms."

56.    With respect to Paragraph 3.1. (ADDITIONAL TERMS, ARBITRATION), the following new subparagraph C. is added:

"C.    TWC and Participant agree that in any arbitration proceeding hereunder, discovery rights, remedies, procedures, duties, liabilities, and obligations shall be governed by California Code of Civil Procedure §1283.05.  In addition, notwithstanding the provisions of subparagraph 3.1.B. above, in an effort to reduce the cost of any arbitration procedure hereunder, TWC and Participant agree to consider in good faith merely obtaining the benefit of using the then-prevailing Commercial Arbitration Rules of the American Arbitration Association (except to the extent expressly set forth elsewhere in this Exhibit CB) and not utilizing the American Arbitration Association administratively."

57.    With respect to Paragraph 3.3.A. (CONTROL OF EXPLOITATION AND MARKETING), the following shall be added as the last sentence thereof:  "Notwithstanding the foregoing, there shall be no sub-distribution of the Picture in the U.S. or Canada unless TWC customarily uses sub-distributors for distribution in the U.S. and/or Canada and at that time with respect to substantially all other motion pictures during the same calendar year."

58.     With respect to Paragraph 3.3.B. (CONTROL OF EXPLOITATION AND MARKETING), the words "reasonable good faith" shall be inserted immediately after the word "its" in the fourth line.

59.     With respect to Paragraph 3.3.C. (CONTROL OF EXPLOITATION AND MARKETING), the words "trailers and" in the first line shall be deleted and the words "for trailers and 5%" shall be deleted from the third line thereof.

60.     With respect to Paragraph 3.4.A.1. (ADDITIONAL TERMS, SALES OF ALL RIGHTS), the word "sum" in the first line shall be changed to "sum(s)".

61.     With respect to Paragraph 3.4.A.2. (ADDITIONAL TERMS, SALES OF ALL RIGHTS), the following shall be inserted immediately after the word "assumption" in the eighth line: "in writing and subject to full performance."

62.     With respect to Paragraph 3.4.B. (ADDITIONAL TERMS, SALES OF ALL RIGHTS), the words "10 business days" shall be substituted for the words "7 days" in each place therein.  In addition, the words "and other material terms" shall be inserted immediately after the word "price" in the fourth line.

63.     With respect to Paragraph 3.5.A. (MISCELLANEOUS, ASSIGNMENT BY PARTICIPANT), the words "completion of services" shall be inserted immediately after the word "after" in the third line; and the words "the release of the Picture" in the third line shall be deleted.

64.     With respect to Paragraph 3.5.A. (ADDITIONAL TERMS, ASSIGNMENT BY PARTICIPANT), the following shall be added after the "Picture" in the third line: "to Participant's loan-out company or other closely held corporation and vice-versa; provided that, and subject to, all parties signing TWC's customary (i) Notice of Irrevocable Authority and (ii) Acknowledgement of Notice of Irrevocable Authority."

65.     In any instance where an allocation of income or costs as between the Picture and any other pictures or pictures must be made, such allocation shall be reasonable and shall be made using good faith business judgment, and may take into account such things as box office performance, cast, and genre, provided that TWC's decision with respect thereto shall be final.

<div align="center">END OF RIDER</div>

# EXHIBIT "DRCB"

This Exhibit is attached to and made part of the Agreement dated as of September 21, 2011, between SLP FILMS, INC. (herein, "TWC"), on the one hand, and BRUCE COHEN PRODUCTIONS (f/s/o BRUCE COHEN) ("Participant") relating to the motion picture project currently entitled "SILVER LININGS PLAYBOOK" (the "Picture").

## <u>NOTE:  PLEASE READ CAREFULLY</u>

**This Exhibit DRCB sets forth the contractual formula to be used solely for the definition, computation, and accounting of Defined Receipts and payment, if any, of Participant's Defined Receipts Contingent Bonus as provided in the Agreement. Participant understands and agrees that:  (i)  the defined terms shall have the meanings described in this Exhibit DRCB; (ii) the words or defined terms used herein may not necessarily correspond in any way to generally accepted accounting principles or any other definitions associated with the practices of accounting or auditing; (iii) there is no guarantee whatsoever that, and it is uncertain whether, any Defined Receipts Contingent Bonus will become payable to Participant, regardless of the level of income, revenues, profits and/or receipts, if any, that TWC, Affiliates or Related Parties, or any distributor or exhibitor realizes from the exploitation of the Picture; (iv) Participant shall be entitled to the payment of Defined Receipts Contingent Bonus amounts only in accordance with the terms hereof, and Participant acknowledges and understands that any such payment is entirely speculative; (v) Participant has been represented by counsel or other representative(s) of their choice in the negotiation of the terms of the Agreement and this Exhibit DRCB; (vi) Participant has a full understanding of the terms of the Agreement and this Exhibit DRCB; (vii) TWC's, Affiliates' and Related Parties' accountings for financial reporting, tax reporting or other purposes are not prepared in the same manner as accountings pursuant to this Exhibit DRCB; (viii) no fiduciary relationship whatsoever exists between TWC and Participant, including without limitation, arising from the obligation of TWC to account for Defined Receipts and potentially to pay a Defined Receipts Contingent Bonus to Participant; (ix) the terms of this exhibit are part of a comprehensive negotiated agreement that contains both economic and non-economic terms; and, which taken as a whole, is the product of an arm's length give and take negotiation whether or not changes have been made to this Exhibit DRCB; and (x) no representations whatsoever, expressed or implied, have been made to Participant that are contrary to this Paragraph.**

**Initialed:  _____  (Participant)**

### DEFINED RECEIPTS CONTINGENT BONUS FORMULA

"Adjusted Defined Receipts" shall mean the remaining Defined Receipts (as defined in Paragraph 1.1.A of the attached Schedule 1, subject to the exclusions set forth in Paragraph 1.1.B of said Schedule), after the deduction of the Defined Receipts Deductions set forth in Paragraph 1.1.C of the attached Schedule 1.

Participant's "Defined Receipts Contingent Bonus" shall be Participant's percentage or share (as set forth in and subject to the applicable terms of the Agreement to which this Exhibit DRCB is attached) of the Adjusted Defined Receipts.

The terms used in this Defined Receipts Contingent Bonus Formula are defined in, and the Defined Receipts Contingent Bonus hereunder shall be accounted for, pursuant to the terms and conditions of the attached Schedule 1.

## <u>SCHEDULE 1</u>

# 1.  DEFINITIONS

## 1.1.  **Defined Receipts**

A.  "Defined Receipts" means the aggregate of all receipts actually received by TWC on behalf of the Picture in U.S. dollars in the U.S. or in a foreign currency which are not Restricted Funds, only from:

1.  TWC's direct distribution of the Picture in theatres and on television ("TV"), including theatrical and non-theatrical exhibitions, and free, cable and pay TV exhibitions.

2.  Distribution of the Picture by a Subdistributor.  With respect to distribution through Subdistributors the following alternative methods of calculation shall apply to the receipts derived therefrom and the distribution costs and fees relating thereto, whichever alternative TWC elects from time to time as to each such Subdistributor: either (a) all such receipts received and earned by the Subdistributor, and all distribution costs of the Subdistributor relating to the Picture, to the extent reported to TWC, shall be treated as though such receipts were earned by TWC and such distribution costs were distribution costs of TWC, and the applicable TWC distribution fee shall include the Subdistributor's distribution fee; or (b) TWC's share of such receipts actually earned and received by TWC from such Subdistributor shall be included in Defined Receipts upon which share TWC shall be entitled to the applicable TWC distribution fee.

3.  Manufacture and distribution of audio-visual cassettes, video discs and all electronic, digital and/or optical storage and/or transmission formats, any analog or digital reproductions, or any similar device and/or format embodying the complete Picture in linear form, whether now known or hereafter devised, which, for the sake of clarity, shall include "Video-On-Demand" (i.e., the Picture being available for display on any consumer viewing device of any nature, whether now known or hereafter devised, at a time selected by the viewer [as opposed to the viewer selecting a time from an exhibition schedule predetermined by an exhibitor or programming service], including, without limitation, by means of so-called video-on-demand and/or internet distribution) (collectively, "Video Devices"); provided that Defined Receipts for Video Devices sold by TWC or by any Subdistributor (whether or not an affiliate of TWC) whose revenues and distribution costs are treated as revenues and distribution costs of Company in accordance with paragraph 1.1.A.2., above, shall be: (A) 20% of (1) the "net wholesale receipts" (as defined below) actually received by Company or any such Subdistributor licensed by Company, from the exploitation of the Picture's home video rights for "rental priced" home videos actually sold and paid for and not returned (less rebates, credits and taxes) and (2) sums actually received by Company through any so-called "revenue-sharing programs" involving all such Video Devices, computed after deducting from the total of such monies the deductible items set forth in (a) through (d) below and (B) 10% of (1) the net wholesale receipts actually received by Company or such Subdistributor from the exploitation of the Picture's home video rights for sell-through and repriced home video rights for sell-through and repriced home videos actually sold and paid for and not returned (less rebates, credits and taxes).

As used in this paragraph 1.1.A.3., the term "net wholesale receipts" shall mean the wholesale selling price derived from the sale at the wholesale level of Video Devices during the applicable accounting period, less the aggregate of the following items (prorated in accordance with the standard practice of TWC):  (a) all adjustments such as returns and other credits, allowances, rebates and refunds, (b) deposits, advances and periodic payments until earned or forfeited, (c) sales, excise and remittance taxes, however denominated, and duties, (d) costs of marketing and advertising such Video Devices, and (e)  subdistribution fees charged, not to exceed 5%.

4.  "Flat Sale" licenses for the theatrical exhibition of the Picture for a specified period for any territory or area (excluding the U.S. and Canada) in consideration of the payment of a specified amount not calculated by a percentage of receipts of the applicable licensee.

5.  Compensatory receipts (less all costs and fees) from copyright infringers of the Picture.

6.  Receipts from theater box office operated by TWC in connection with four-wall or road show exhibitions of the Picture to the extent receipts from all such exhibitions taken as a whole exceed costs incurred for all such exhibitions.

7.  The royalties as provided in Schedules A (Music) and B (Soundtrack Records, Merchandising/Publishing), which are attached hereto and incorporated herein by this reference.

B.  Defined Receipts Exclusions

The following are not included in Defined Receipts:

1.  Box office or other amounts retained by any theater or other exhibition venue (except as specified in Paragraph 1.1.A.6 hereof) for their own account; and receipts of:  broadcasters and other transmitters by all means now known or hereafter devised; wholesale or retail distributors, licensors or sellers of Video Devices, audio devices and other products; book or music publishers; merchandisers and retailers; or any other similar Person,  whether or not any or all such excluded Persons are owned, operated or controlled by TWC, Affiliates or Related Parties.

2. Amounts received from advance payments or security deposits unless earned by exhibition or broadcast, or (subject to Paragraph 1.1.A.2) unconditionally non-returnable, and refunds, rebates or adjustments granted to other Persons by TWC.

3. Amounts payable in foreign currency and not received by TWC in the U.S. due to remittance restrictions ("Restricted Funds"). Restricted Funds shall not be included in Defined Receipts nor accounted for unless and until they have been received by TWC in U.S. dollars in the U.S. or expended by TWC in the territory in which held, except as provided in 1.1.B.3(a) below.

(a) If any Defined Receipts Contingent Bonus becomes payable to Participant under this Agreement, Participant may notify TWC in writing that Participant desires to have included in Participant's Defined Receipts Contingent Bonus, Participant's share of Restricted Funds in a particular territory and designate a bank or other representative in such country, to whom payment may be made for Participant's account. Upon TWC's receipt of such notice and all required permissions, such payment shall be made to Participant's representative at Participant's expense. Upon payment of Participant's share of Restricted Funds, TWC shall have no further obligation to account for such Restricted Funds whether as Defined Receipts or otherwise.

(b) On Participant's written request, TWC shall report to Participant the amount of Restricted Funds (if any) which under this Paragraph 1.1.B.3 have not yet been included in Defined Receipts as of the closing date of the most recent statement which has been furnished to Participant under Paragraph 2.1 below.

4. Amounts collected in connection with the distribution of the Picture as taxes or for payment of taxes (e.g., admission, sales, use or value added taxes, etc.).

5. Amounts collected from exhibition of the Picture contributed to charitable organizations.

6. Receipts from remakes, prequels, sequels, radio or TV series or other derivative uses of the Picture or any element thereof.

7. Salvage value or receipts derived from print stocks, film or tape clips, stock footage, stills, props, sets, wardrobe, or other items included in Cost of Production/Acquisition except and only any sums received from the sale of cars purchased specifically in connection with the Picture and sold within six months after completion of photography, which sums shall be included in the Defined Receipts of the Picture.

C. Defined Receipts Deductions

"Defined Receipts Deductions" means the aggregate of all costs, expenses and charges paid, advanced or incurred by TWC or a Subdistributor, on a continuing basis, directly or indirectly, in connection with the distribution, exhibition and exploitation of the Picture including without limitation:

1. Theatre Level Advertising Expenses

"Theatre Level Advertising Expenses" shall mean all payments made, sums expended or credits allowed by TWC in connection with advertising and exploitation at the theatre level (whether or not TWC shares with the exhibitor the cost of such advertising and exploitation). "Theatre Level Advertising" shall include, but not be limited to, advertising in newspapers, on radio and television, personal appearances by actors and other production personnel in connection with or for the Picture, salaries and expenses of TWC's publicity-advertising personnel and field exploitation persons, all of which shall be appropriately allocated (in TWC's business judgment) to the Picture to the extent that such expenses shall be paid or incurred in connection with advertising at the theatre level.

2. Conversion

Conversion to U.S. dollars and remittance of Defined Receipts to the U.S., including costs and fees of contesting the imposition of restrictions.

3. Checking

Checking attendance and receipts, and investigating unauthorized use of the Picture, whether payable to or incurred by TWC employees or other Persons.

4. Collections

Collection of Defined Receipts including attorneys' and auditors' fees and costs, and liability incurred by TWC in connection therewith.

5. Residuals

All costs incurred and payments paid or payable, as required by applicable collective bargaining agreements by reason of exhibition of the Picture or any part thereof in any media, or equivalent payments. Any such payments made to or on behalf of Participant shall be deducted against Participant's Defined Receipts Contingent Bonus (if any) to the extent not prohibited by the applicable collective bargaining agreement. Any payments under this Exhibit DRCB made to Participant prior to payment of residuals shall constitute a credit against such residuals to the extent not prohibited by the applicable collective bargaining agreement; provided that any such credit, when applicable, shall not be taken a second time against Participant.

6. Trade Dues/Piracy

The allocable portion, as determined in TWC's business judgment, of dues, assessments, legal fees and costs (including antitrust and piracy matters), and contributions to the MPAA, AMPTP or similarly constituted or substitute Persons throughout the universe.

7. Licenses

All licenses, duties, customs charges, fees or any other amounts in addition to those referred to herein incurred in connection with the licensing of the Picture for exhibition and other uses of the Picture.

### 8. Taxes

Taxes and governmental fees of any nature, and however characterized, including costs of contesting them, and interest and penalties thereon (other than TWC or Subdistributor corporate income taxes), imposed directly or indirectly on the Picture or any part thereof or on the Defined Receipts or the license, distribution or exhibition of the Picture, or collection, conversion or remittance of monies connected therewith. Foreign remittance and withholding taxes charged to the Picture shall be determined as follows: the then-current effective tax rate for a particular country and distribution medium shall be multiplied by the Defined Receipts from such country and distribution medium. TWC shall be entitled to claim or receive, and in no event shall Participant be entitled, directly or indirectly, to claim, share or participate in or otherwise receive or derive any and all tax or other benefits of any kind or nature arising out of, in connection with or otherwise accruing in respect of any and all taxes (however denominated) described in this Paragraph 8, including without limitation, and all tax credits or deductions directly or indirectly attributable thereto or based thereon. In no event shall Defined Receipts Deductions or Cost of Production/Acquisition be reduced, or Defined Receipts be increased, by the amount of any such tax (however denominated) recouped by TWC because of the manner in which such taxes are elected to be treated by TWC in filing net income, corporate, franchise, excess profits or similar tax returns.

### 9. Copyright and Royalties

Copyright, trademark and patent costs in connection with the Picture and royalties payable with respect thereto, including without limitation, royalties payable to manufacturers of recording and reproducing equipment.

### 10. Other Versions

Preparing, making, delivering and using foreign, radio, TV, home video or any other media versions of the Picture, or titles thereof, or making changes required by censorship and rating considerations, or for any other purpose.

### 11. Reissue Costs

All costs directly related to the theatrical reissue of the Picture.

### 1.2. **Miscellaneous Definitions**

#### A. Includes

"Includes" (and equivalents "included" or "including") and "such as", are illustrative and not intended to be limiting.

#### B. Person

Any corporation, partnership or other business entity or natural person.

#### C. TWC

For the purposes hereof, "TWC" means The Weinstein Company and any owned or controlled subsidiaries of The Weinstein Company engaged in the business of theatrical, non-theatrical and television distribution of motion pictures. TWC shall not include: any theatrical exhibitor, radio or television transmitter or broadcaster; any satellite, cable or other pay television operator, nor any Person transmitting the Picture to such operators or any one else by any method or delivery system; any wholesale distributor or retailer of video discs, videocassettes or similar devices; any book or music publisher; any producer or distributor of audio products; any merchandiser; or any other similar Person, whether or not any of the foregoing excluded Persons are owned in whole or in part, operated or controlled by TWC.

#### D. Affiliate

For purposes of this Exhibit DRCB, "Affiliate" shall mean any entity (other than TWC) that is a subsidiary of The Weinstein Company (i.e., an entity of which The Weinstein Company owns, directly or indirectly through one or more intermediaries, more than 50% of the voting stock) and each other entity which, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, The Weinstein Company . For purposes of this definition, the terms "control," "controls," and "controlled" mean the power to direct the management and policies of such entity, whether through the ownership of voting securities, by contract or otherwise.

#### E. Related Party

For purposes of this Exhibit DRCB, "Related Party" shall mean any entity (other than an entity included in the definitions of TWC and Affiliate) which The Weinstein Company owns directly or indirectly through one or more intermediaries, more than 10% of the voting stock.

#### F. Subdistributor

A Subdistributor is a person other than TWC licensed by TWC for the distribution of the Picture with an obligation to report receipts and expenses to TWC. An Affiliate of TWC (other than owned or controlled subsidiaries) shall be deemed a Subdistributor if it distributes the Picture in one or more countries or media.

#### G. Territory

1. U.S. is the United States, together with any other countries licensed by or through the distributing organization(s) servicing the U.S. for TWC.

2. Canada is Canada, together with any other countries licensed by or through the distributing organization(s) servicing Canada for TWC.

3. The United Kingdom (U.K.) is United Kingdom of Great Britain and Northern Ireland, Republic of Ireland, Channel Islands, Isle of Man, Gibraltar, Malta.

4. Foreign is all countries (other than U.S., U.K. and Canada) and any other areas in the universe.

5. All foregoing references to countries include their territories and possessions, and political subdivisions.

6. Distribution to armed forces, airlines, ships and other means of transportation shall be included in the territory of their respective national origin.

#### H. Agreement

"Agreement" is the agreement to which this exhibit is attached, together with this exhibit, and any other attached amendments, exhibits and schedules.

## 2.  ACCOUNTING

### 2.1.  Statements

TWC shall give Participant quarterly summary statements relating to the calculation of Participant's Defined Receipts Contingent Bonus for the first two years after the date established by TWC as the date of first general release of the Picture in the U.S. (or if there is no U.S. general release, then upon general release outside the U.S.); semiannually for the next two years; and annually thereafter if any Defined Receipts Contingent Bonus is payable to Participant or, if none due, only on Participant's written request, provided such request is made not more than once per year. Statements shall be issued within 90 days after the end of each TWC accounting period and accompanied with payment of any amount shown due Participant. Notwithstanding the foregoing, if the Picture has been made available for U.S. TV syndication and the first statement thereafter issued shows that more than $500,000 in Defined Receipts would be needed before Participant would be entitled to receive Defined Receipts Contingent Bonus, TWC shall have no further obligation to render statements to Participant. If the Picture is generally reissued in the U.S. theatrically, then TWC shall resume quarterly statements for one year from the date of such reissue and thereafter in accordance with the above.

### 2.2.  Incontestability

Statements are subject to correction or amendment by TWC at any time. Should TWC make any overpayment to Participant hereunder for any reason, TWC shall have the right to deduct and retain for its own account an amount equal to any such overpayment from any sums that may thereafter become due or payable by TWC to Participant or for Participant's account, or may demand repayment from Participant in which event Participant shall repay the same when demand is made. Each statement and all matters of accounting and methodology are conclusive and binding on Participant 24 months after each statement is issued, unless Participant objects in writing within that 24 month period, specifying in detail the particular items on the statement and the nature of the objection(s). If the objections are raised timely, but are not resolved, Participant may initiate a claim with respect to such objections, provided such claim is instituted within 6 months following the date of the initial written objection or prior to the expiration of the period of the applicable statute of limitations, whichever occurs first. Participant may not  institute or maintain a claim against TWC with respect to any item or transaction on a statement, whether in a lawsuit, an arbitration or any other proceeding unless Participant has first provided TWC with a timely and detailed written objection to such item or transaction. TWC must keep books of account for any given transaction on a statement for 24 months after the initial reporting of such transaction.    All time periods referred to in this paragraph commence upon issuance of the first statement on which any particular transaction is reflected, and the reappearance of a transaction in cumulative statements shall not cause the running of any time period to toll or recommence.

### 2.3.  Books

The items reflected in the statements, to the extent they have not become incontestable or have not been previously examined, may be examined at Participant's expense, once in each 12 month period (the first of which commences upon issuance of the first statement hereunder).    Such statements may only be examined by a national firm of reputable CPA's, the selection of which is subject to TWC's approval not to be unreasonably withheld.    TWC shall make available for examination those books of account with respect to the distribution of the Picture.    Each examination of any statement or statements for a particular accounting period must be concluded within the earlier of six months following commencement or an aggregate of 30 examination days.    A copy of the report of such examination shall be delivered by Participant to TWC when it is made available to Participant. Participant shall have no right to inspect or copy any tax return of TWC or any Subdistributor, Affiliate or any Related Party, or require the production of any such tax return or any information contained therein.

### 2.4.  Withholdings

All amounts payable to Participant under this Agreement shall be subject to all applicable present and future laws and regulations requiring the reporting, deduction or withholding of payments for taxes or otherwise. TWC shall have the right to make such deductions and withholdings, and the payment or reporting thereof to the governmental agency concerned in connection with TWC's good faith determination of such laws and regulations shall constitute payment hereunder to Participant. TWC shall not be liable to Participant for the making of, or failure to make, such reports, deductions and/or withholdings or the payment thereof to the governmental agency concerned.    In any such event, Participant shall have the sole responsibility for bringing and maintaining any claims against third parties regarding such reporting, deductions or withholdings.

### 2.5.  Address

All statements shall be deemed issued when mailed to Participant at the address for notices under this Agreement.

### 2.6.  Reserves

TWC shall have the right from time to time and in its business judgment to establish and adjust reserves for any distribution costs, uncollected accounts or other items which TWC believes in its business judgment will be deductible from or credited against Defined Receipts hereunder.    TWC agrees to liquidate reserves within an appropriate period of time within TWC's business judgment.

### 2.7.  Tax Credits

TWC shall have the sole right to take whatever credits (including investment tax credits), deductions or other benefits that may be available throughout the universe, with respect to taxes and excises payable in any

way in connection with the Picture or otherwise, without any accounting, credit or payment obligation to Participant.

## 3. ADDITIONAL TERMS

### 3.1. Arbitration

TWC and Participant agree that any dispute between them concerning the rights and obligations of TWC and Participant under this Exhibit DRCB, whether sounding in contract or tort, may only be adjudicated in accordance with the following procedure:

A. Either (i) TWC and Participant shall mutually select an arbitrator, or (ii) if they cannot agree on such arbitrator, TWC and Participant shall each select one arbitrator and those two arbitrators shall then select a third arbitrator.

B. The parties shall arbitrate the dispute in accordance with the then-prevailing arbitration rules of JAMS (except to the extent expressly set forth elsewhere in this Exhibit DRCB) and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.

### 3.2. No Representation

TWC has no obligation to distribute the Picture and if it does so, Participant acknowledges that TWC has no obligation to maximize Defined Receipts and has not made any representations with respect to the likelihood or amount of Defined Receipts or Defined Receipts Contingent Bonus, if any, which will or may be derived from distribution of the Picture.

### 3.3. Control of Exploitation and Marketing

A. As between TWC and Participant, TWC shall have exclusive and perpetual control of the distribution, marketing, advertising, publicizing, exploitation, sale or other disposition of the Picture and may distribute, or withhold or withdraw the Picture from distribution at its sole discretion with respect to one or more territories or media. TWC may distribute the Picture with other pictures whether or not TWC has any interest in such other pictures.

B. For all purposes under this Exhibit DRCB, allocations of Defined Receipts, costs, rights and other matters relating to the Picture and other motion pictures shall be allocated by TWC in its business judgment and in accordance with TWC's prevailing business practice.

C. With respect to trailers and shorts exhibited with the Picture outside of the U.S. and Canada, Defined Receipts shall be reduced by 3% for trailers and 5% for shorts.

D. As between TWC and Participant, TWC owns all rights to the Picture and its Defined Receipts , including the right to encumber, transfer or dispose of them and Participant shall have no right, title or interest therein. Participant acknowledges that its sole right under this Exhibit is a contractual right to contingent compensation in the form of, and measured by, the Defined Receipts Contingent Bonus Formula.

E. TWC, its agents and assigns, in its and their business judgment, shall be entitled to distribute the Picture on a percentage basis or make flat sales, make and cancel contracts, adjust and settle disputes, and give allowances and rebates to distributors, licensees, exhibitors or other Persons whether or not any such entity is owned, operated or controlled by TWC, Affiliates or Related Parties.

F. TWC shall have complete discretion in determining the extent, if any, to which it will audit or check payments or charges to TWC or assert claims with respect thereto.

G. Participant acknowledges that TWC is part of a large, diversified international group of affiliated companies engaged in a variety of business activities. TWC has informed Participant that it frequently enters into business transactions with Affiliates and Related Parties, and Participant acknowledges and agrees that TWC is entitled (but is not obligated) to, and may, in its sole discretion, enter into agreements or other arrangements with Affiliates and Related Parties in connection with any or all rights relating to the Picture, including, without limitation, all exploitation rights and all subsidiary, ancillary or other rights relating thereto (the "Exploitation Rights"). Participant hereby acknowledges and agrees that TWC is under no obligation, express or implied, to offer the Exploitation Rights or any part thereof to unaffiliated or unrelated third parties, whether in lieu of or in addition to offering such rights to Affiliates and Related Parties, or to otherwise seek or secure any business arrangements with any unaffiliated or unrelated third parties with respect thereto. Without limiting the generality of any other provision of the Agreement, Participant hereby waives any right to make any claim or seek any relief, whether at law or in equity (specifically including injunctive relief), asserting the existence and/or breach of any such express or implied obligation.

In addition, Participant acknowledges and agrees that any agreement or other arrangement by TWC with an Affiliate or Related Party regarding the Exploitation Rights shall be conclusively presumed to be fair, reasonable and unobjectionable unless Participant shall establish that such agreement or other arrangement is on financial terms which, taken as a whole, are materially less favorable economically to TWC than the terms of Similar Transactions generally entered into by TWC with unaffiliated or unrelated third parties; or if there are no such unaffiliated or unrelated Similar Transactions, then by TWC with Affiliates or Related Parties (as applicable); or if there are no such Similar Transactions with Affiliates or Related Parties, then by Affiliates with any other Affiliate or Related Party (any such materially less favorable agreement or arrangement being hereinafter referred to as a "Less Favorable Arrangement". For purposes hereof, the term "Similar Transactions" shall mean agreements or other arrangements relating to motion pictures similar to the Picture (including TWC or non-TWC Pictures) which involve rights which are comparable to the Exploitation Rights or any relevant part thereof. TWC and Participant agree that in any arbitration between them under Paragraph 3.1 above, concerning whether TWC has entered into a Less Favorable Arrangement, the arbitrator(s) shall select an independent national accounting firm with entertainment accounting expertise who shall be present with the arbitrator(s) during the arbitration proceedings, and, on the basis of the evidence presented (including any expert testimony presented by the parties and admitted into evidence), shall provide a

written report to the arbitrator(s) solely on the issue of whether there was a Less Favorable Transaction; and the above referenced records and report shall be kept in strictest confidence by the accounting firm and disclosed only to the arbitrator(s) who shall have authority, subject to a protective order maintaining the confidentiality of the information to the fullest extent permitted by law, to disclose to the parties only those relevant portions of the report indispensable to the adjudication of the issue.  If pursuant to Paragraph 3.1 above, the arbitrator(s) conclude(s) that TWC has entered into a Less Favorable Arrangement with an Affiliate or Related Party, Participant's sole and exclusive remedy shall   be the right to receive an adjustment on the next accounting statement when due, including any additional payments that may be required, pursuant to Paragraph 2.1 hereof, modified to the extent required to render such Less Favorable Arrangement not a Less Favorable Arrangement.

3.4.   **Sales of All Rights**

A.   If after completion and delivery of the Picture to TWC, TWC sells all its right, title and interest in the Picture (other than to an Affiliate or through merger or consolidation), Participant may elect that:

1.   The net sum received by TWC shall constitute Defined Receipts hereunder but further income of purchaser in connection with the Picture shall not be included in Defined Receipts, or,

2.   The net sum received by TWC shall not be included in Defined Receipts and all receipts and expenses (other than the purchase price paid to TWC) of the purchaser relating to the Picture shall be treated for purposes of accounting to Participant, as though they were receipts and expenses of TWC, provided that upon assumption by purchaser of such obligation, the sale shall be considered a novation and TWC shall thereafter have no obligation of any kind to Participant.

B. Participant's election shall be made within 7 days after TWC notifies Participant in writing that it proposes to make such sale and identifies the purchaser and purchase price.  If TWC does not receive written notice of Participant's notice, then TWC shall have the right, but not the obligation, to make such election on Participant's behalf.

3.5.   **Assignment by Participant**

A.   Participant may assign Participant's right to receive   its Defined Receipts Contingent Bonus hereunder in whole or in part, at any time after the release of the Picture, subject to TWC's approval not to be unreasonably withheld and provided that such assignment does not subject TWC to any additional liability in connection with the assignment.  However, in no event shall TWC be obligated to account to more than one Person. In any event, TWC's obligation to pay in accordance with any assignment, or designation of a disbursing agent, shall be conditioned on TWC's receipt of written notice thereof, in form satisfactory to TWC, and TWC's payment in accordance therewith shall satisfy TWC's payment obligations to Participant hereunder.  Participant's right to examine TWC's books of account shall not be assignable without TWC's prior written consent and in any event shall be limited to one Person.

B.   TWC shall have the right of first refusal with respect to any proposed assignment of Participant's right to receive Defined Receipts Contingent Bonus hereunder upon equivalent terms (to the extent economically matchable) offered to Participant by a bona fide third party. Participant shall notify TWC of the terms of any such proposed assignment and TWC shall have 7 business days within which to elect to accept such terms. Participant shall make no change in such terms which are adverse to Participant's interest without giving TWC the opportunity to accept such changed terms.  If TWC does not elect to accept such terms, then Participant shall be free to accept the proposed terms of assignment from such bona fide third party provided that if such proposed

assignment is not concluded within 30 days following the expiration of the 7 business day period referred to above, TWC's right of first refusal under this Paragraph 3.5.B shall revive and shall apply to each subsequent offer received by Participant. This Paragraph 3.5.B shall not apply to family gifts.

3.6.   **General Terms**

A.   This Agreement is not for the benefit of any third party and shall not create a partnership, joint venture, agency, trust or fiduciary obligation between TWC and Participant or make Participant TWC's agent or create a relationship between TWC and Participant other than creditor-debtor to the extent amounts are due hereunder.

B.   TWC may, in its business judgment, commingle Defined Receipts with any other funds.

C.   Nothing in this Exhibit DRCB or the Agreement shall give Participant the right to a lien on the Picture or Defined Receipts.

D.   Participant shall not be entitled to interest or any other gain which may accrue as a result of TWC's obligation to pay Participant's Defined Receipts Contingent Bonus (or part thereof) even in the event of a dispute between Participant and TWC concerning the interpretation of this Exhibit DRCB, non-payment hereunder or otherwise.

E.   Headings are for convenience only and are of no effect in construing the contents of this Agreement.

F.   Participant waives any right at law or equity to revoke, terminate, diminish or enjoin any rights granted or acquired by TWC hereunder by reason of a claimed non-payment of monies allegedly due and payable hereunder, it being agreed that Participant's sole remedy for any such alleged non-payment shall be limited to a claim for any such money that is due and payable hereunder.

**END OF EXHIBIT DRCB**

**SCHEDULE "A"**
**REFERRED TO IN PARAGRAPH 1.1.A.7 OF EXHIBIT DRCB**

**MUSIC PUBLISHING**

1.  A royalty equal to sixteen-and-two thirds percent ($16^{2/3}$%) of Music Publishing Contingent Proceeds ("MPCP") received by TWC from the exploitation of music publishing rights (i.e., mechanical reproduction, public performance, sheet music/folios and synchronization) to the original music and/or lyrics written specifically for and synchronized in the Picture as generally released (the "Music") shall be included in Defined Receipts.

2.  Music Publishing Defined Receipts ("MPDR") shall mean all monies actually received by TWC with respect to the Music excluding any advance, guarantee or minimum royalty payment received by TWC in connection with any subpublishing, collection, licensing or other agreement, unless such payment is specifically attributable to the Music.

3.  MPCP shall mean MPDR less the following:
    (a)     Ten percent (10%) of MPDR, as an administration fee to TWC.

    (a)     Royalties or other monies payable by TWC to the composer(s) and/or lyricist(s) of the Music.

    (b)     All additional shares of MPDR payable by TWC to such composer(s), lyricist(s) and/or any other third party co-publishers, administrators or other participants.

    (c)     Collection or other fees customarily and actually charged by The Harry Fox Agency, Inc., or any other collection agent  used by TWC.

    (d)     Copyright registration fees and the costs of transcribing  lead sheets.

    (e)     All other administration and exploitation expenses incurred with respect to the Music including, without limitation, the costs of producing demonstration records, advertising and promotion expenses, costs or amounts payable to third-party publishers, co-publishers, administrators, publishing participants, subpublishers, licensees, trustees or collection agents, attorneys' and accountants' fees directly related to the Music, and damages and expenses incurred by reason of infringement claims, but excluding rents, overhead, salaries and other similar general expenses.

4.  If Participant is entitled to receive a direct royalty or other type of payment with respect to the Music, then no portion of MPCP will be included in Defined Receipts.

**THE WEINSTEIN COMPANY**
**MUSIC PUBLISHING**
**SCHEDULE "A" TO EXHIBIT DRCB**

**SCHEDULE "B"**
**REFERRED TO IN PARAGRAPH 1.1.A.7 OF EXHIBIT DRCB**


1.    **SOUNDTRACK RECORDS:**  In the event TWC receives any royalties in respect of the soundtrack album(s) ("Album") and/or other  "phonorecords" (as that term is defined in the U.S. Copyright Act of 1976, 17 U.S.C. Sections 101, et. seq.) derived from the soundtrack of the Picture ("Soundtrack Records"), then TWC agrees that such royalties will be computed as follows for inclusion in Defined Receipts:

1.1    If an Affiliate distributes Soundtrack Records, then the royalty included in Defined Receipts shall equal $2^{1/2}$ % ("Royalty Rate") of 90% of the suggested retail list price (or the equivalent wholesale royalty) for net sales of the Album through normal retail channels in the United States ("USNRC Sales").  The Royalty Rate shall be otherwise defined, computed, reduced and accounted for on the same basis that the Affiliate customarily accounts to third party recipients including, without limitation, in respect of foreign sales, configurations variations, taxes, flat fee licensing, coupling, singles, free goods, packaging deductions, royalty base and all other reductions and deductions.  Royalties hereunder shall only be included in Defined Receipts prospectively after the recoupment from the aggregate royalty payable (or accrued against advances or other charges) by TWC in respect of Soundtrack Records (including royalties payable to Participants, producers, record companies, film personnel, music supervisors, musicians and the royalty payable pursuant to this Schedule B) of the following:      (i) all recording costs of the master recordings embodied in Soundtrack Records; (ii) any re-recording costs of master recordings which are re-recorded for Soundtrack Records; and (iii) all costs of converting the master recordings in the Picture from motion picture recordings to phonograph record use (including, re-recording costs, reuse fees, editing, sweetening, etc.).

1.2    In the event that TWC receives its royalties from the exploitation of Soundtrack Records by a third party distributor, then the royalty to be included in Defined Receipts shall be the "Soundtrack Contingent Proceeds" (as defined below).

1.3.    "Soundtrack Contingent Proceeds" shall mean all revenues received by TWC from the exploitation of Soundtrack Records, if any, as set forth in the applicable Soundtrack Records agreement after deduction of the following costs and third party royalties:

(a)    A sum equivalent to the actual dollar amount (including any fixed cash amounts, advances and/or royalties) actually paid to all third party performers and/or participants with respect to the music/soundtrack contained in Soundtrack Records and/or the Picture, including without limitation, cash payments and/or royalties payable to Participants, producers, record companies, film personnel, music supervisors and musicians.

(b)    A sum equivalent to all artwork costs for Soundtrack Records to the extent such artwork costs are paid by or charged to TWC, remixing and remastering costs, re-recording costs, reuse fees, license fees and similar costs attributable to the recording/production and/or licensing of the master recordings embodied on Soundtrack Records, except to the extent such costs are included in the negative cost of the Picture and to the extent such Soundtrack Records costs and fees have actually been incurred directly or indirectly by TWC.

(c)    Any legal fees or related expenses incurred by TWC for outside legal counsel engaged at TWC's election to: document and/or negotiate the applicable Soundtrack Records agreement; in protecting or defending TWC's rights, privileges and benefits with respect to Soundtrack Records and/or any master recordings recorded/acquired for the Picture and/or Soundtrack Records; and/or in connection with any dispute involving any release/distribution agreement pertaining to Soundtrack Records.

(d)    In the event the Soundtrack Records distributor pays TWC any nonreturnable advance against royalties, a reasonable reserve shall be applied towards (i) third party payments payable prior to the Soundtrack Record distributor's recoupment of such advance at the "net" Participant rate; and (ii) unrecouped costs incurred by TWC in respect of any Soundtrack Records and/or in excess of the budgeted cost of the music for the Picture.

1.4.    Notwithstanding the foregoing, no royalties shall be included hereunder for any so-called "storyteller" or "read-along" phonorecords or for any phonorecords embodied in other merchandise or for any audiovisual devices now known or hereafter devised.

1.5.    If Participant is entitled to receive a direct royalty or other type of payment with respect to   Soundtrack Records, then no royalties from Soundtrack Records will be included in Defined Receipts.

2.    <u>MERCHANDISING/PUBLISHING</u>.  With respect to items of merchandising (including interactive games and other products and services) and book publication (including children's storytelling recordings, as distinguished from soundtrack records, but excluding souvenir programs and similar publications) based on the Picture, then:

2.1    For items sold by a licensee of TWC, the royalties TWC receives from such licensee shall be included in Defined Receipts of the Picture after first deducting (i) a percentage deduction of:  fifty percent (50%), inclusive of subdistributor fees, for items sold in the U.S.; sixty-five percent (65%), inclusive of subdistributor fees, for items sold outside the U.S.; and fifteen percent (15%) plus any subdistributor's fees for any book novel; and (ii) out-of-pocket costs and royalties to third parties; or

2.2    For items are sold by TWC at the wholesale or retail level, at TWC's discretion, either:  (i)  an amount equal to seven (7%) of the wholesale price of such items sold by TWC at the wholesale level (less a reasonable allowance for returns); or (ii)  an amount equal to seven percent (7%) of fifty percent (50%) of the gross retail revenues of such items sold by TWC at the retail level (less a reasonable allowance for returns) shall be included in Defined Receipts of the Picture after first deducting (a) a percentage deduction of fifty percent (50%) for items sold in the U.S.; sixty-five percent (65%) for items sold outside the U.S.; and fifteen percent (15%) with respect to any book novel; and (b) out-of pocket costs and royalties to third parties.

2.3    In no event shall any items of merchandise be treated as falling under both provisions 2.1 or 2.2 above.

2.4    If Participant is entitled to receive a direct royalty or other type of payment with respect to the   exercise of merchandising and book publication rights, then no royalties therefrom will be included in Defined Receipts.

**THE WEINSTEIN COMPANY**
**<u>SOUNDTRACK RECORDS/MERCHANDISING/PUBLISHING</u>**
**<u>SCHEDULE "B" TO EXHIBIT DRCB</u>**

## RIDER TO EXHIBIT "DRCB"

This Rider is attached to and made a part of Exhibit "DRCB" which is attached to the agreement ("Agreement") dated as of September 21, 2011, between SLP FILMS, INC. (herein, "TWC"), on the one hand, and BRUCE COHEN PRODUCTIONS (f/s/o BRUCE COHEN) ("Participant") relating to the motion picture project currently entitled "SILVER LININGS PLAYBOOK" (the "Picture").

1.      With respect to the Defined Receipts Contingent Bonus Formula, if Participant's percentage or share of Defined Receipts Contingent Bonus pursuant to the Agreement is an amount of adjusted Defined Receipts after an Initial Contingent Proceeds Startpoint, expenses that may have been deducted in reaching such Initial Contingent Proceeds Startpoint may not again be deducted (i.e., no double deductions) from Defined Receipts after such Initial Contingent Proceeds Startpoint to calculate adjusted Defined Receipts.  In addition, if an expense item is limited by this Rider, when the limit is reached for one purpose, it is reached for all purposes.

2.      With respect to Paragraph 1.1.A. (DEFINITIONS, DEFINED RECEIPTS), the words "or credited to" shall be inserted immediately after the word "by" in the second line.

3.      With respect to Paragraph 1.1.A.2. (DEFINITIONS, DEFINED RECEIPTS), Subdistributors hereunder shall be deemed to include TWC sales agents (if any).

4.      With respect to Paragraph 1.1.A.3. (DEFINITIONS, DEFINED RECEIPTS), the words "or more than 50% of the Picture" shall be inserted immediately after the word "Picture" in the sixth line.

5.      With respect to Paragraph 1.1.A.5. (DEFINITIONS, DEFINED RECEIPTS), the words "excluding costs of TWC in-house counsel in connection with such copyright infringement claims" shall be inserted immediately after the word "costs" but within the parenthetical; and the words "unfair competition, trademark, and/or patent infringement and/or defamation claims" shall be inserted immediately after the word "infringers."

6.      With respect to Paragraph 1.1.A.5. (DEFINITIONS, DEFINED RECEIPTS), the phrase "or similar causes of action (e.g., trademark, commercial appropriation)" shall be inserted at the end of the item.

7.      With respect to Paragraph 1.1.A.6. (DEFINITIONS, DEFINED RECEIPTS), the following shall be added at the end: "; provided, however, that the share of box office receipts retained by or allowed to such theater shall not exceed the amount which would have been retained by, or allowed to such theater had such theater not been owned, operated, managed or controlled by TWC, its affiliates or subsidiaries."

8.      With respect to Paragraph 1.1.A.7 (DEFINITIONS, DEFINED RECEIPTS), the words "and other receipts" shall be inserted immediately after the word "royalties" in the first line.

9.      With respect to Paragraph 1.1.A.7. (DEFINITIONS, DEFINED RECEIPTS) and Paragraph 2. of Schedule "B" (MERCHANDISING/PUBLISHING), no costs of manufacture, advertising or shipping related to the sale or distribution of merchandise items shall be deducted.

10.      With respect to Paragraph 1.1.A. (DEFINITIONS, DEFINED RECEIPTS), the following are added as new Paragraphs 8. and 9. thereof: "8. Receipts from the distribution of trailers for the Picture; and 9. Receipts allocable to the Picture as received from the Copyright Tribunal or similar bodies."

11.      With respect to Paragraph 1.1.A. (DEFINITIONS, DEFINED RECEIPTS), the following is added as new subparagraph 10:

> "10.      Subject to the requirements of any guild or union agreement appropriate to the Picture, and if and to the extent TWC's general custom and practice with respect to calculating, defining and accounting for royalties or receipts (if any) from the new technology (not yet being used by TWC) currently known as 'video-on-demand' (whether by internet delivery or otherwise), differs from the method of calculating, defining and accounting for such royalties and receipts (if any) set forth in Paragraph 1.1.A.3. of this Exhibit DRCB, then such royalties and receipts (if any) shall be calculated, defined and accounted for in accordance with TWC's general custom and practice in general with respect to such 'video-on-demand' exploitation at the time of any such exploitation."

12.      With respect to Paragraph 1.1.B.2. (DEFINITIONS, DEFINED RECEIPTS EXCLUSIONS), the words "unconditionally non-returnable" in the fourth line shall be deemed deleted and the words "forfeited or non-returnable, subject to adjustment and settlement," shall be inserted in place of such deletion.

13.      With respect to Paragraph 1.1.B.3. (DEFINITIONS, DEFINED RECEIPTS EXCLUSIONS), after the word "TWC" in the seventh line, the words "for any purpose" shall be inserted; and the following shall be added at the end of the Paragraph, "or unless freely remittable to the U.S. in U.S. dollars.  There shall be no unreasonable delay with respect to the conversion and remittance of foreign receipts hereunder."

14.      With respect to Paragraph 1.1.B.5. (DEFINITIONS, DEFINED RECEIPTS EXCLUSIONS), the words "any charitable screening" shall be inserted immediately after the word "from" in the first line.

15.     With respect to Paragraph 1.1.B.7. (DEFINITIONS, DEFINED RECEIPTS EXCLUSIONS), the words "or such other major items" shall be inserted immediately after the word "cars" in the fifth line.

16.     With respect to Paragraph 1.1.C.3. (DEFINITIONS, DEFINED RECEIPTS DEDUCTIONS, CHECKING), the following shall be added thereto:  "Any and all checking costs shall be appropriately allocated to the Picture and shall not exceed one percent (1%) of the worldwide Defined Receipts of the Picture.  Also, there shall be no charge made for checking by TWC employees, other than with respect to four walls, road shows, or other special extenuating circumstances."

17.     With respect to Paragraph 1.1.C.4. (DEFINITIONS, DEFINED RECEIPTS DEDUCTIONS, COLLECTIONS), the word "outside" shall be inserted immediately after the word "including" in the first line and also immediately after the word "and" in the second line.

18.     With respect to Paragraph 1.1.C.5. (DEFINITIONS, DEFINED RECEIPTS DEDUCTIONS, RESIDUALS), the third sentence thereof beginning with the word "Any" and ending with the word "Participant" shall be deleted.

19.     With respect to Paragraph 1.1.C.6. (DEFINITIONS, DEFINED RECEIPTS DEDUCTIONS, TRADE DUES), the following sentence is added to the end of this paragraph:  "Notwithstanding the foregoing, Defined Receipts shall not be reduced by more than: (1) $250,000 in the aggregate for domestic trade association fees payable by TWC to the M.P.A.A., A.M.P.T.P. and/or any similarly constituted or substitute person or successor organization to which TWC may now or hereafter belong; and (2) $250,000 in the aggregate for foreign trade association fees payable by TWC to the M.P.E.A. and/or any successor organization to which TWC may now or hereafter belong on account of receipts or proceeds from the distribution of the Picture.

20.     With respect to Paragraph 1.1.C.8. (DEFINITIONS, DEFINED RECEIPT DEDUCTIONS, TAXES), the words "(appropriately allocated)" shall be inserted immediately after the word "nature" in the first line.

21.     With respect to Paragraph 1.1.C.8. (DEFINITIONS, DEFINED RECEIPT DEDUCTIONS, TAXES), the following sentence is added at the end of the paragraph: "The words 'corporate income taxes' appearing herein shall mean taxes based on net income, so-called excess profits, and, to the extent such are in the nature of taxes based on the net income or so-called excess profits taxes –franchise and corporation income taxes.  Also, to the extent any such taxes paid by TWC are deducted and subsequently refunded, an appropriate retroactive adjustment shall be made."

22.     With respect to Paragraph 1.1.C.8. (DEFINITIONS, DEFINED RECEIPT DEDUCTIONS, TAXES), the following words shall be added to the last sentence: "In the event of any tax refunds and/or in the event of any interest adjustment, Gross Receipts shall be adjusted if and as appropriate with respect thereto."

23.    With respect to Paragraph 1.2.G.1. (DEFINITIONS, MISCELLANEOUS DEFINTIONS, TERRITORY), the following words shall be added thereto:  "and all transportation companies, armed services or institutions flying the flag of the U.S."

24.    With respect to Paragraph 2.1. (ACCOUNTING, STATEMENTS), the following words in line 11 "not more than once per year" shall be replaced with "at least one year after the earlier of the last request or statement."

25.    With respect to Paragraph 2.1. (ACCOUNTING, STATEMENTS), "$500,000" shall be changed to "$750,000" in the seventeenth line; and, the following shall be added after the word "Participant" in the twentieth line: "; provided, however, TWC will provide Participant with no more than one statement per year upon Participant's written request."

26.    With respect to Paragraph 2.1. (ACCOUNTING, STATEMENTS), the following is added to the last sentence thereof:  "and if, in the first U.S. free television window in the U.S., the Picture is broadcast on prime time network television in the U.S. or exhibited on HBO/Cinemax, Showtime/The Movie Channel,  The Disney Channel or similar pay cable stations, TWC shall account therefor by issuing a quarterly statement for one year starting on the accounting period within which the Picture has been so exhibited, accompanied by payment of the amount, if any, shown thereby to be due Participant."

27.    With respect to Paragraph 2.2. (ACCOUNTING, INCONTESTABILITY), the number "36" shall be substituted for the numeral "24" in each place therein.

28.    With respect to Paragraph 2.2. (ACCOUNTING, INCONTESTABILITY), the following shall be inserted immediately after the word "objection" in the nineteenth line: "(or if an audit is commenced before and completed on a timely basis after said 36 month period, then Participant may initiate a claim within 6 months after completion of such audit)."

29.    With respect to Paragraph 2.2. (ACCOUNTING, INCONTESABILITY), the following sentence shall be inserted immediately after the sentence ending with the word "first" in the twentieth line:  "The foregoing period within which Participant may raise objections shall recommence, but only with respect to certain transactions or items included in previous statements that have been thereafter revised and/or corrected."

30.    With respect to Paragraph 2.2 (ACCOUNTING, INCONTENSABILITY), the time periods provided shall be extended to a period equal to any period of time during which an examination of Participant's records is occurring, plus, if there are less than six months remaining in the period provided, an additional period of six months thereafter.

31.    With respect to Paragraph 2.3. (ACCOUNTING, BOOKS), the word "national" is deleted from the seventh line, and the following sentence shall be inserted

immediately after the word "withheld" in the ninth line: "The 'big eight' accounting firms excluding Price Waterhouse are pre-approved by TWC subject to any conflict of interest that may arise."

32.    With respect to Paragraph 2.4. (ACCOUNTING, WITHHOLDINGS), if the Defined Receipts Contingent Bonus payable to Participant pursuant to this Agreement shall exceed that permitted by any law or governmental regulation, the Defined Receipts Contingent Bonus shall be reduced to the maximum permitted payment.  TWC shall assist (but shall not be required to incur any expense or liability to itself) Participant in the application to the appropriate authority for the right to pay Participant all of the proceeds payable to Participant pursuant to the Agreement.  If TWC is in possession of such proceeds at such time, TWC shall pay the difference between the proceeds payable pursuant to the Agreement and the proceeds previously permitted to be paid, at such time, if ever, as it may be legally permissible for TWC to pay such difference.

33.    With respect to Paragraph 2.6. (ACCOUNTING, RESERVES), the following shall be added thereto:  "TWC shall not be entitled to establish any reserve for residuals unless the statement on which such reserve is established reflects receipt of Defined Receipts which would result in TWC's obligation to pay said residuals.  In any event, TWC shall liquidate any such reserves within 12 months after establishing the same unless there is any claim and/or litigation pending, in which case TWC may continue to maintain such reserves."

34.    With respect to Paragraph 3.1.A. (ADDITIONAL TERMS, ARBITRATION), subparagraph A. shall be deemed deleted in its entirety and the following inserted in its place:

"A.    TWC and Participant shall attempt in good faith to mutually select an arbitrator experienced in motion picture accounting matters (and in so doing, may, without obligation, use an American Arbitration Association list of qualified arbitrators).  If TWC and Participant are unable to mutually agree on an arbitrator within two (2) weeks, then TWC and Participant shall, within the subsequent one (1) week period, each select one arbitrator; and within the next subsequent one (1) week period, those two arbitrators shall then select a third arbitrator."

35.    With respect to Paragraph 3.1.B. (ADDITIONAL TERMS, ARBITRATION), the following shall be inserted in the last three sentences thereof:  "If the award rendered by the arbitrator(s) exceeds TWC's last settlement offer to Participant by 20% or more, the TWC shall reimburse Participant for Participant's reasonable outside attorney and accounting fees in connection with such arbitration procedure.  If the award rendered by the arbitrator(s) is less than 80% of TWC's last settlement offer to Participant, then Participant shall reimburse TWC for TWC's reasonable outside attorney and accounting fees in connection with the arbitration procedure.  If the award is between 20% less than and 20% more than TWC's last settlement offer to Participant, then the arbitrator(s) may award reasonable outside attorney and accounting fees in connection

with the arbitration as the arbitrator(s) deems appropriate in the exercise of such arbitrator(s)'s discretion.

36.     With respect to Paragraph 3.1.B. (ADDITIONAL TERMS, ARBITRATION), the following shall be deemed added thereto:  "The prevailing party in the arbitration shall be reimbursed by the other party for the prevailing party's share of American Arbitration Association administration fees, any arbitrator compensation and any rental fees for arbitration hearing rooms."

37.     With respect to Paragraph 3.1. (ADDITIONAL TERMS, ARBITRATION), the following new subparagraph C. is added:

"C.     TWC and Participant agree that in any arbitration proceeding hereunder, discovery rights, remedies, procedures, duties, liabilities, and obligations shall be governed by California Code of Civil Procedure §1283.05.  In addition, notwithstanding the provisions of subparagraph 3.1.B. above, in an effort to reduce the cost of any arbitration procedure hereunder, TWC and Participant agree to consider in good faith merely obtaining the benefit of using the then-prevailing Commercial Arbitration Rules of the American Arbitration Association (except to the extent expressly set forth elsewhere in this Exhibit DRCB) and not utilizing the American Arbitration Association administratively."

38.     With respect to Paragraph 3.3.A. (CONTROL OF EXPLOITATION AND MARKETING), the following shall be added as the last sentence thereof: "Notwithstanding the foregoing, there shall be no sub-distribution of the Picture in the U.S. or Canada unless TWC customarily uses sub-distributors for distribution in the U.S. and/or Canada and at that time with respect to substantially all other motion pictures.

39.     With respect to Paragraph 3.3.B. (CONTROL OF EXPLOITATION AND MARKETING), the words "reasonable good faith" shall be inserted immediately after the word "its" in the fourth line.

40.     With respect to Paragraph 3.3.C. (CONTROL OF EXPLOITATION AND MARKETING), the words "trailers and" in the first line shall be deleted and the words "for trailers and 5%" shall be deleted from the third line thereof.

41.     With respect to Paragraph 3.4.A.1. (ADDITIONAL TERMS, SALES OF ALL RIGHTS), the word "sum" in the first line shall be changed to "sum(s)".

42.     With respect to Paragraph 3.4.A.2. (ADDITIONAL TERMS, SALES OF ALL RIGHTS), the following shall be inserted immediately after the word "assumption" in the eighth line: "in writing and subject to full performance."

43.     With respect to Paragraph 3.4.B. (ADDITIONAL TERMS, SALES OF ALL RIGHTS), the words "10 business days" shall be substituted for the words "7 days"

in each place therein.  In addition, the words "and other material terms" shall be inserted immediately after the word "price" in the fourth line.

44.    With respect to Paragraph 3.5.A. (MISCELLANEOUS, ASSIGNMENT BY PARTICIPANT), the words "completion of services" shall be inserted immediately after the word "after" in the third line; and the words "the release of the Picture" in the third line shall be deleted.

45.    With respect to Paragraph 3.5.A. (MISCELLANEOUS, ASSIGNMENT BY PARTICIPANT), the following shall be added after the word "Picture" in the fourth line:  "to Participant's loan-out company or other closely held corporation and vice-versa: provided that, and subject to, all parties signing TWC's customary (i) Notice of Irrevocable Authority and (ii) Acknowledgement of Notice of Irrevocable Authority.

46.    With respect to Paragraph 3.5.B. (MISCELLANEOUS, ASSIGNMENT BY PARTICIPANT), the following sentence shall be added to the end of the paragraph: "This Paragraph B shall not apply to family gifts, or transfers by operation of law, nor to an assignment by Participant which is donative in nature, or to an assignment by Participant to Participant's loan-out company or other closely held corporation and vice-versa; provided that, and subject to, all parties signing TWC's customary (i) Notice of Irrevocable Authority and (ii) Acknowledgement of Notice of Irrevocable Authority.

47.    In any instance where an allocation of income or costs as between the Picture and any other pictures or pictures must be made, such allocation shall be reasonable and shall be made using good faith business judgment, and may take into account such things as box office performance, cast, and genre, provided that TWC's decision with respect thereto shall be final.

<center>END OF RIDER</center>